## AMERICAN NAT. BANK OF BEAUMONT

### v.

### WINGATE.

### No. 4878.

Court of Civil Appeals of Texas.

Beaumont.

Sept. 17, 1953.

Rehearing Denied March 18, 1954.

Orgain, Bell & Tucker, Beaumont, for appellant.

Baldwin & Votaw, Beaumont, for appellee.

WALKER, Justice.

The plaintiff is the appellee and the defendant, the appellant.

The action is one to recover a tract of land. Plaintiff claims to have acquired title to this land by adverse possession under Article 5510, R.S. 1925. The tract is in the D. Burrell League in Jefferson County. It covers 175 acres and was formerly owned by the plaintiff. In 1937, she conveyed it (joined by her children) to the defendant bank in payment of a community debt owed by her deceased husband and herself. She testified that afterward, in 1938, she began to hold possession of the land adversely to the defendant and claims that she remained in adverse possession of the land, in person and by tenant, since that time. The action was filed on April 12, 1951.

The cause was tried to the court with a jury. Only one issue was submitted to the jury; this issue and the jury's answer were as follows:

"Do you find from a preponderance of the evidence that the plaintiff, Mrs. Elsie Wingate, either in person or by tenants, has been in peaceable, adverse and continuous possession of the property in controversy, cultivating, using and enjoying

the same for a period of ten years or more prior to the filing of this suit on the 12th day of April, 1951. Answer: Yes."

On this verdict the trial court rendered judgment (as we construe the judgment) in behalf of plaintiff against defendant, for the title to and possession of the land.

The defendant bank has appealed from this judgment. Of the Points of Error assigned, it is only necessary to consider those attacking the sufficiency of the evidence to support the judgment.

Separate findings of fact and statements of the evidence have been filed and only such reference to the facts are made in this opinion as are needed to explain our conclusions.

## Opinion

(1) The defendant has title to the land under and by virtue of the plaintiff's deed unless the plaintiff's proof of adverse possession supports the verdict.

(2) The land in suit lies in an enclosure which covers approximately 520 acres. As we have stated, the land in suit covers only 175 acres. The enclosure is made by a fence; and excepting some fences appurtenant to the plaintiff's dwelling and out buildings, which enclose only a very small area, there are no partition fences within the area enclosed by the outer fence. All of the land in suit is within the general enclosure; none of it is within the fences appurtenant to the plaintiff's dwelling.

The land in suit is roughly in the form of a reverse "L", the upper bar of which extends due north and south entirely across the enclosure from the northern fence to the southern fence; the lower bar of the "L" extends westward, to the western fence of the enclosure. It is bordered on the south by the southern fence of the enclosure.

The land in suit thus divides the land enclosed by the outer fence. In the north-western part of the enclosure is a tract of 172 acres. This belongs to the plaintiff, and in the northwestern corner of this

(and thus at the extreme northwestern corner of the enclosure) is the plaintiff's dwelling. Immediately east of the land in suit are two rectangular tracts, each of 85 acres. The northern one belongs to the plaintiff's sister, Mrs. Maggie Wingate, and the southern one belongs to the plaintiff. The land belonging to plaintiff's sister is in the enclosure, and the plaintiff uses it (at least for grazing cattle), with her sister's consent.

The plaintiff has resided continuously in her present dwelling since a time several years prior to her deed to the defendant bank.

All this very land (that is, plaintiff's, defendant's and Mrs. Maggie Wingate's) but no more, lay within this enclosure for many years before plaintiff made her deed to the defendant; and it was used, excepting the small part farmed by Rodney Christ, for the same purposes after as well as before the plaintiff's deed to the defendant. The purposes mentioned are grazing and farming in rice and the use made of the land by the plaintiff is described in part (5) of this opinion. The practice is to farm the land in rice only at intervals, and when the land lay fallow it was used to graze cattle. The cultivation of rice has been done by C. A. Kiker since plaintiff's deed to the defendant, as a tenant either of the plaintiff or of the defendant, and he also cultivated the enclosure in rice in 1934, prior to plaintiff's deed.

The plaintiff's deed to the defendant is dated March 7, 1937. There was some testimony by the plaintiff that she first began to claim the land in 1938, when the fence about the enclosure was restored and repaired. The time in 1938 when this work was done on the fence is not very clearly shown by the evidence, and a period of at least a year very probably elapsed between the date of plaintiff's deed and the date when plaintiff says that her present claim to the land began.

There is the following evidence concerning the restoration and repair of the

fence: At some time in 1938, before Rube Wingate returned to this country (and to the area in which the land in suit is situated) in August of that year, the fence along the western side of the enclosure was in bad condition and the fence elsewhere about the enclosure needed repairs, and the western fence was completely or substantially rebuilt from the northwestern corner to the southwestern corner; this newly rebuilt fence was of four strands of barbed wire; and it was placed a very short distance, some two to four feet, inside of the original fence line. The western fence bordered the Burrell-Wingate road, and there was evidence that the work done by the County in maintaining this road had widened it and required withdrawal of the fence to protect it from the County's machines. This western fence was 4,834 feet long, not much less than a mile. The northern 2,353 feet of this fence was on the plaintiff's own land, that is, the 172 acres she owned in the northwestern part of the enclosure. The southern 2,481 feet of this fence was on the land in suit. At the same time repairs were also made to the fence about the rest of the enclosure. This part of the fence was several miles long. The extent and magnitude of these repairs is not shown. In legal effect, all of this work was done by the plaintiff. There is also evidence that later, in 1938 or 1939, the plaintiff and the owners of land adjoining the enclosure on the north, acting together, restored about a mile of the northern fence of the enclosure. This northern fence was 7,870.03 feet long; so that about two-thirds of it was restored. The jury could have found that this part of the northern fence was completely rebuilt. Because of briers which had grown up along the old fence this new fence was placed a few feet inside the original fence line. The plaintiff furnished the posts used in this work and the adjoining land owners who acted with her furnished the labor and the wire. How much of this new part of the northern fence extended along the northern boundary of the land belonging to the plaintiff cannot be determined; but the jury could

have found that a substantial part of it was placed on the land in suit, along its northern boundary.

Plaintiff, nor anyone else, ever told the officers of the defendant bank that the plaintiff was claiming the land; and the officers of the defendant bank who had this land in charge, did not know until a time in 1951, shortly before this suit was filed in April of that year, that the plaintiff was claiming the land. For notice of her adverse claim the plaintiff must depend upon her own uses of the land and her conduct pertaining to the land.

The defendant's first argument attacking the sufficiency of the evidence to support the judgment is that plaintiff never manifested the adverse character of her claim in such a way as to charge the defendant with notice that this adverse claim existed. Defendant says that plaintiff was bound to do this because she remained in possession, using the land after her deed as she did before that time, and that for a space of time (which, as we have shown, must have been about a year) she actually did not claim the land adversely.

(3) We agree with the defendant that if the plaintiff was in possession of the land at the time of her deed and remained in possession afterward, she was bound to give notice of the change in the nature of her possession from subservience to defendant's title to a claim adverse to that title. The rule is stated as follows in Evans v. Templeton, 69 Tex. 375 at p. 378, 6 S.W. 843, 844: "In order to make the plea of limitation effectual in such case [the court refers to the case where the vendor/grantor remains in possession, using the land as he did before his deed], he must show *some notorious act of ownership over the property, distinctly hostile to the claim of the grantee;* and the adverse possession after this must continue for a sufficient length of time before suit to complete the statutory bar. The 'possession must not only be actual, but also visible, continuous, notorious, distinct, and hostile, and of such a character as to indicate unmistakably an assertion

of claim of exclusive ownership in the occupant.'"

This ruling was adhered to at the next term in the City of Galveston v. Williams, 69 Tex. 449, 6 S.W. 860; but it was not applied because the conduct of the vendor/grantor and his vendee/grantee gave notice of adverse claim. The rule quoted from Evans v. Templeton was later applied by the Commission of Appeals in Scott v. Rodgers, 6 S.W.2d 731, and by the Supreme Court in Kidd v. Young, 144 Tex. 322, 190 S.W. 2d 65. It was applied by the Court of Civil Appeals in Epps v. Finehout, 189 S.W.2d 631, and, in a different situation, by the Commission of Appeals in W. T. Carter & Bro. v. Holmes, 131 Tex. 365, 113 S.W.2d 1225. And see: Oury v. Saunders, 77 Tex. 278 at page 282, 13 S.W. 1030.

■ The sum total of these decisions is that ordinarily, if the grantor, at the time of his deed, was in possession of the land conveyed by him, and continued in possession thereof, making only that use of it which he made before his deed, his possession is presumably subservient to the title which he conveyed and consistent with it, and the grantee may assume this is true unless he receives notice, or is charged with notice, to the contrary. That is, the grantor's possession alone for the uses specified does not give notice of the fact that it has become adverse, and the grantee simply is not required to anticipate that his grantor intends or will intend to take his land away from him by adverse possession.

■ This rule of decision is in accord with the general rule that one in possession who has recognized the title of another must give notice that he has ceased to hold the land in subservience to the title of the other and has, instead, become an adverse claimant. See: Chapman v. Dickerson, Tex.Civ.App., 223 S.W. 318; Davis v. Lund, Tex.Com.App., 41 S.W.2d 57; Federal Land Bank v. King, Tex.Com.App., 122 S.W.2d 1061; Doherty v. Jensen, Tex. Civ.App., 174 S.W.2d 77; Id., 143 Tex. 64, 183 S.W.2d 453; 2 Tex.Jur. 114.

For a rule contrary to that quoted from Evans v. Templeton, plaintiff cites: Smith v. Montes, 11 Tex. 24; Harne v. Smith, 79 Tex. 310, 15 S.W. 240; Thomson v. Weisman, 98 Tex. 170, 82 S.W. 503; Dickey v. Forrester, Tex.Civ.App., 148 S.W. 1181; Moore v. McDonald, Tex.Civ.App., 298 S. W. 662; Texas & P. R. Co. v. Maynard, Tex.Civ.App., 51 S.W. 255; Great Southern Life Ins. Co. v. Dodson, Tex.Civ.App., 155 S.W.2d 379; and Green v. West Texas Coal Mining & Development Co., Tex.Civ. App., 225 S.W. 548. Some of these opinions contain language which seems to support the plaintiff's position, but the cases adjudicated by these opinions can all be distinguished from the facts of this case on grounds which are stated in the defendant's brief, and we consider them not applicable to this case.

■ (4) However, it is our conclusion that the rule of decision just discussed is not material, and that the argument of the defendant bank cannot be sustained; because this argument is founded upon the assumption that the proof showed as a matter of law that the plaintiff was in possession of the land in suit and was using this land when she made her deed to the defendant and that she continued in possession and in the use of this land thereafter. The evidence does not support this assumption as a matter of law.

A year or more intervened between the plaintiff's deed and the restoration and repair of the fence with which she says that her adverse claim began, and the evidence concerning the use made and the acts done in possession of the land in suit during this time is very indefinite and general. The plaintiff resided at the northwestern corner of the enclosure at all times material to this suit, but her residence was on her own property and at a substantial distance from the land in suit. The evidence really does not show with any certainty what was done with the land in the enclosure during the period between the plaintiff's deed and the restoration and repair of the fence. The land was not cultivated during this period, and the testimony of Rube Wingate (espe-

cially that given during his second examination) about the condition of the fence around the enclosure, especially, the western fence, shows that cattle probably could not have been kept in the enclosure. Rube Wingate gave the following testimony about the western fence:

"A. You see, I was there part of 1937.

"Q. When you were there, I will ask you whether or not there was such a fence along here that would keep stock in and out? A. You mean before the new one was built?

"Q. Before the new one was built. A. No, it would not keep stock in or out because it was full of holes and the fence had been there, in fact, it was just an old fence line."

We think that the evidence, at most, only raised the issue for the jury, whether the plaintiff was in possession of the land in suit when she conveyed this land to defendant, and whether she continued so thereafter.

 Of course, if the plaintiff was not in possession of the land in suit at the date of her deed and thereafter continued so to be, her restoration and repair of the fence in 1938 and 1939 and her subsequent use of the land amounted to a re-entry upon the land and a resumption of possession of the land a substantial period of time after her deed. Texas & P. R. Co. v. Maynard, 51 S. W. 255.; 2 C.J.S. Adverse Possession, § 95 (e), p. 655. The grantor, it is agreed, can re-acquire title by adverse possession under proper circumstances; and such a re-entry by the plaintiff would begin a new possession and the statutes of limitation would begin to run.

(5) We consider next the defendant's second argument attacking the sufficiency of the evidence to support the judgment. This argument is that plaintiff's possession was not exclusive and continuous for the statutory period and that the defendant had possession of the land four times at intervals between the restoration and repair of the fence in 1938 and 1939; with which

plaintiff says her adverse claim began, and the date when this suit was filed. The land in suit, or rather, that part of it which could be, was farmed in rice in 1938, 1942, 1944, 1948 and 1950 by C. A. Kiker, a son-in-law of the plaintiff's. Defendant says that in 1942, 1944, 1948 and 1950 Kiker was the defendant's tenant of the land in suit.

The plaintiff's reply is that Kiker was her own tenant during these years.

The evidence material to this argument of the defendant's is as follows: Kiker made an oral agreement with plaintiff in 1938 giving him the right to farm in rice all of the land in the enclosure which could be farmed for that purpose, the agreement to continue as long as he wished. In no sense was this a contract; many material terms were not settled. For instance, future rentals were not fixed. Rice culture requires that land lie fallow for long periods and provision for this was not made; the years Kiker would farm the land were not fixed. Too, Kiker was not obligated to farm any land.

The evidence leaves it uncertain whether this agreement was made before or after the restoration and repair of the fence done in 1938; but there is evidence that Kiker did farm in the enclosure in 1938 under this agreement, and it is probable that at least the concluding part of his operations was after the restoration and repair of the fence which was done in that year. Some of the land he cultivated in rice was a part of the land in suit.

There is also evidence that this oral agreement has been respected by the plaintiff and that Kiker entered the enclosure under it and farmed at least the plaintiff's own land under it in 1942 and 1944 and farmed a part of plaintiff's own land in 1948 and 1950. During the last two of the four years mentioned, he subleased a part of plaintiff's own land to the plaintiff's son-in-law Arthur Gilmore. Further, there was evidence that Kiker intended to cultivate rice in the enclosure during the year this cause was tried. For the years beginning with 1942 Kiker paid rent to the plaintiff as is hereinafter stated.

On the other hand, the proof shows as a matter of law that for each of the years 1942, 1944, 1948 and 1950, Kiker made an oral agreement with the defendant (acting through Pondrom) whereby the defendant let to him for the purpose of farming in rice all that part of the land in suit which could be used for that purpose, and it was agreed by Kiker and Pondrom that this was 100 acres. The rent was fixed at $3 an acre or a total rental each year of $300. A separate agreement was made for each of the four years mentioned, which was to endure until farming operations for the particular year were concluded; but the terms of these agreements were always the same.

There is evidence that the plaintiff did not know these agreements between Kiker and the defendant bank had been made.

During each of the four years mentioned, Kiker farmed the land in suit in rice and after his farming operations were ended paid the defendant the rentals agreed upon.

The evidence does not show what rent Kiker paid the plaintiff for 1938; but for the years 1942, 1944, 1948 and 1950, he paid plaintiff rent of $3 an acre as he did defendant, and after the crop year, but he paid plaintiff only for her own land. Kiker said that for 1942 he paid plaintiff's sister rent for the land belonging to this person; but what was done afterward does not appear. However, the material fact is that Kiker did not pay two rents for the land in suit; he did not pay plaintiff rent for that land but, instead, paid this rent to the defendant as we have stated. The plaintiff accepted, without question, the rentals paid to her and made no demand for more.

Kiker said that he had a separate agreement with the plaintiff for her own land for each of the years 1942, 1944, 1948 and 1950, just as he had done with the defendant bank, and the circumstances (the plaintiff's use of the enclosure) required him to make an agreement of some sort, but the tenor of the plaintiff's evidence is that she did not realize that Kiker was going to pay her only for her own land. We assume that

this evidence raised an issue for the jury, whether the plaintiff knew that Kiker intended to pay her rent only for her own property.

However, there is no evidence that Kiker misrepresented any fact to plaintiff or that he attempted to suppress knowledge or his relation with the defendant. The evidence pertaining to this matter is to the contrary. Thus plaintiff testified that when Kiker delivered his checks to her for his rent he told her that these were the rent for her "rice ground"; and these statements were literally true. Furthermore, the plaintiff lived in the northwestern corner of the enclosure, and the location of Kiker's crops and the area cultivated by Kiker were apparent to her and her sons. Furthermore, Kiker represented to the agency which supplied him with water for irrigation that a part of the land he would cultivate belonged to the defendant bank and a part belonged to the plaintiff.

The evidence shows, too, that Kiker first learned of the plaintiff's adverse claim in 1947, when he attempted to forestall a purchase by a stranger of a part of the land in suit. He got this information from his brother-in-law Rube Wingate. The plaintiff never had told him of her claim.

Further, there is no evidence that the defendant knew of the agreement of 1938 between Kiker and the plaintiff, nor is there anything in proof which would charge the defendant with notice of this agreement. It does not appear that the present officers of the defendant bank knew that Kiker had farmed the land in suit in 1938, but if they had this information would not have suggested to them that Kiker would do so again in 1942 under an agreement with the plaintiff, especially after an agreement had been made with Kiker by the defendant.

Further, the defendant bank did not have actual knowledge of the plaintiff's adverse claim until shortly before this suit was filed in 1951. Pondrom did not know, when he made his agreements with Kiker in 1942, 1944, 1948 and 1950, that the plaintiff claimed the land in suit adversely.

The evidence is that Kiker made each of his agreements with the defendant at a time when he was not in possession of any land in the enclosure, and at a time when the plaintiff was occupying the land herself and thus knew that Kiker did not have possession of it. When Kiker was not farming in the enclosure the plaintiff kept cattle in there, as did her sons Rube and Hal Wingate, with her consent, and sometimes Kiker had cattle of his own in the enclosure, also with the plaintiff's consent. However, as we construe the evidence, the plaintiff exercised control over the enclosure during these periods and was in possession of it; Kiker had no possessory rights and the relation between him and the plaintiff concerning the cattle resembles an agistment. It must also be said in addition that the evidence is uncertain regarding the times when Kiker's cattle were in the enclosure.

The agreement for 1942 between Kiker and the defendant bank was made in the latter part of 1941, and Kiker entered the land in suit, to farm it under this agreement, in January 1942.

Such evidence as there is concerning the dates when Kiker made his agreements with defendant after 1942 is by way of inference from Kiker's statement that he entered the land under these agreements. This statement necessarily implies that the agreement was made before the entry for farming; but the agreements after that for 1942 are really not material since less than 10 years have elapsed since the agreement for 1942 was made.

■ (6) On these facts we conclude that Kiker was the defendant's tenant for 1942 and not the plaintiff's.

Plaintiff's claim that Kiker was her tenant is founded upon the oral agreement of 1938 between her and Kiker; it is her theory of the facts that this remained in force and attached to the land in suit.

However, this agreement of 1938 was not a contract and bound neither Kiker nor the plaintiff. Kiker was free to terminate the agreement and make his contracts with the defendant.

■ Furthermore, there was no estoppel in the plaintiff's favor. Stated in general terms, the rule of decision is that one who takes or holds possession of land under another, by virtue of an agreement with the latter that he shall do so, is estopped to deny his landlord's right of possession, so that, in consequence, if he attorns to a third person without the landlord's consent, this attornment does not affect the first tenancy and the first landlord does not lose his possession. See: Cobb v. Robertson, 99 Tex. 138, 86 S.W. 746 and 87 S.W. 1148; Juneman v. Franklin, 67 Tex. 411, 3 S.W. 562; and see: McKie v. Anderson, 78 Tex. 207, 209, 14 S.W. 576; Stevenson v. Rogers, 103 Tex. 169, 172, 125 S.W. 1, 29 L.R.A.,N.S., 85.

■ Estoppel under the general rule does not come into operation, however, until the tenant takes or assumes to hold possession. It is this and not the prior agreement (at least, one like that between plaintiff and defendant in 1938) which creates the estoppel. If he does not take or have possession, the tenant-to-be can repudiate his agreement with the first landlord and attorn to another. 51 C.J.S., Landlord and Tenant, § 268, p. 912; 36 C.J. 1228, §§ 567–570; 32 Am.Jur. 110, § 102; Wright v. Graves, 80 Ala. 416; William James Sons Co. v. Hutchinson, 73 W.Va. 488, 80 S.E. 768; Brown v. Grayson, 160 Tenn. 374, 24 S.W.2d 894. This was Tiffany's view of the estoppel when applied in an action of ejectment. Tiffany classified the estoppel in favor of the first landlord, when applied in the action of ejectment, as one in pais, protecting the landlord against a breach of confidence. See Tiffany's Landlord and Tenant, § 78, Subsec. c., pp. 437 and 438 (Ed. of 1912).

There are expressions in Texas decisions which are in accord with this view of the estoppel. See: Turner v. Smith, 11 Tex. 620 at page 629; Flanagan v. Pearson, 61 Tex. 302; Juneman v. Franklin, 67 Tex. 411, 3 S.W. 562; McKie v. Anderson, 78

Tex. 207, 209, 14 S.W. 576; Buford v. Wasson, 49 Tex.Civ.App. 454, 109 S.W. 275.

The only other reason occurring to us for which defendant might be denied the right to claim Kiker for its tenant is the possibility that to give defendant this right might involve bad faith or sharp practice toward the plaintiff by the defendant and thus accomplish something in the nature of a fraud, as by an entry into the enclosure ostensibly under the plaintiff but secretly under the defendant bank. However, the evidence completely rebuts this possibility. In the first place (and this ought to settle the matter since the defendant bank owned the land in suit) the defendant bank actually did not know that the plaintiff claimed the land adversely (constructive knowledge by force of law is not actual knowledge) and did not know and was not charged with knowing that Kiker had made any agreement with the plaintiff concerning the land in suit. In the second place, Kiker knew that the defendant bank owned the land in suit; he and his wife joined the plaintiff in her deed to the bank; and he did not know before 1947 that the plaintiff claimed the land adversely. Too, Kiker never made any misrepresentation to the plaintiff; after 1938 he never paid her rent for the land in suit, but, instead, only paid her for her own land and actually told her so. The plaintiff, as we have pointed out, lived in the enclosure; the location and apparent area of Kiker would presumably have been $300 and she knew how much money she had received; each of the payments to her by Kiker would presumbly have been $300 larger if the land in suit had been involved in the payments to her. Nor did Kiker make any effort to suppress knowledge of his relations with defendant bank. Instead, as we have pointed out, he declared it at least to the agency which furnished him water for irrigation. True, Kiker was plaintiff's son-in-law and the relation between him and plaintiff was not at arm's length; but we have been unable to see that Kiker committed any fraud upon or performed any sharp practice toward the plaintiff, even if the plaintiff did not know about his agreements with the defendant

bank. If Kiker did not know of the plaintiff's adverse claim there was no special reason why he should discuss the agreement between him and the defendant bank with the plaintiff. Kiker, in fact, seems to have acted honestly and openly, without suspecting that the plaintiff thought him to be occupying the land in suit for herself instead of for the owner, namely, the defendant bank.

(7) These conclusions require that the defendant's second argument attacking the sufficiency of the evidence be sustained. Kiker was the defendant's tenant of the land in suit during at least the year 1942 and in all probability during 1944, 1948 and 1950. However, the tenancy during 1942 interrupted the operation of the statute of limitation, less then 10 years expired between termination of Kiker's possession of the land as defendant's tenant in 1942 and the date when this suit was filed in April, 1951. The plaintiff's possession was not exclusive and continuous for 10 years and therefore gave her no title against the defendant.

The judgment of the trial court must therefore be reversed and, since the defendant's title was proved by the plaintiff's conveyance to said defendant, judgment for title and possession must be rendered in behalf of the defendant bank against the plaintiff. Point 1 and the other points of error related thereto are sustained. The defendant was entitled to an instructed verdict; and it is unnecessary to consider points of error which do not concern the sufficiency of the evidence to support the verdict.

(8) In her counter-points 1 and 2 the plaintiff has argued that defendant has no pleading on file which had any legal effect and that as a result she was not required to prove the grounds of action alleged by her and further, that the defendant bank was not entitled to put in proof any evidence whatsoever. The defendant filed an answer consisting of a plea of not guilty and a plea of the two-year statute of limitations and also plead a cross-action in trespass to try title. This cross-action was

dismissed before trial; the two year statute was not involved in this case; and thus the defendant's answer, so far as the merits are concerned, came down to the plea of not guilty. The plaintiff argues that her suit is to remove cloud and that a plea of not guilty does not lie in such a suit. The defendant argues that the suit was actually one to recover the title to land, to be dealt with as an action in trespass to try title, and we agree with the defendant. If, in form, the petition contains allegations made in suits to quiet title, it also contains allegations showing that the plaintiff claims title to the land against the defendant by virtue of adverse possession; and this was, in fact, the only claim of title which the plaintiff had to the land. As we have stated several times, the plaintiff had previously conveyed the land to the defendant. Of the four paragraphs in the petition alleging plaintiff's grounds of action, paragraphs 1, 2 and 4 are such allegations as are made in trespass to title when the plaintiff alleges title generally and also by adverse possession. The petition actually contains every allegation listed in T.R. 783 except an allegation of disseizin by the defendant, and this allegation is not essential to the maintenance of trespass to try title. In substance and effect, the petition sues for land, that is, the ownership and the right to possession, and the allegations of cloud in paragraph 3 and the special prayer for removal of the cloud seem only incidental and formal. The decision is Rockhold v. Lucky Tiger Oil Co., Tex.Civ.App., 4 S.W.2d 1046, cited by the plaintiff, is not in point. There, the plea of not guilty was not filed in answer to the petition; it was filed in answer to a cross-action which actually was in trespass to try title. The question was, what proof was admissible under the petition and not, what proof was admissible under the supplemental petition. The petition incidentally alleged the plaintiff's title specially.

Too, the defendant's plea of not guilty was at least equivalent to a general denial. The plaintiff argues that if it was it admitted her title, but we do not so construe it for at least the reason that the defendant's plea of not guilty ought to be construed as expressing the intention which normally would be expressed by such a plea if filed in answer to a petition containing the formal allegations in trespass to try title. But the plaintiff has not taken her own petition fully into account. The plaintiff did allege that the defendant had set up adverse claim to the land but immediately before that also alleged "that notwithstanding the facts above alleged, the defendant is asserting some character of claim to the above lands and tenements the *exact nature of which is unknown to plaintiff.*" It seems to us that a general denial would charge the plaintiff with knowing what the nature of the defendant's claim was; it would not admit that defendant was making no claim at all.

The judgment of the trial court is reversed and judgment is here rendered that plaintiff take nothing against the defendant.

## On Motion for Rehearing

In our original opinion we held that the plaintiff's claim of Kiker for her tenant could not be sustained on either of three possible grounds, namely, that she had made a contract with him, that he or the Bank was estopped to deny a tenancy under her, and that if Kiker's occupancy after 1938 were given the effect of interrupting her adverse possession and thus defeating it in favor of the Bank, she would have been imposed upon. It seemed to us then, and so it seems now, that these were the only possible grounds on which plaintiff could have claimed Kiker as her tenant and used his occupancy to complete ten years of adverse possession; and we have nothing to add to the comments in our opinion respecting contract and estoppel. However, the argument filed in support of the plaintiff's motion for rehearing has emphasized this matter of imposition, and we add the following comments regarding it.

1. Even though the land in suit was in the adverse possession of the plaintiff when the Bank made its lease to Kiker in the latter part of 1941 or when the Bank made the subsequent leases to Kiker, the Bank had the power to make a valid lease of said land; and plaintiff's adverse posses-

sion did not affect the validity of those leases. The old rule at common law was to the contrary. See: Taylor's Landlord and Tenant, 9th Ed., § 85; Tiffany on Landlord and Tenant, § 75. Tiffany noted that the old rule no longer existed in many jurisdictions and we think that this rule does not obtain in this state since it is held that the owner can convey land in the adverse possession of another and, subject to exceptions not applicable here, choses in action are ordinarily assignable. See: Carder v. McDermett, 12 Tex. 546; Perry v. Smith, Tex.Com.App., 231 S.W. 340; 5 Tex.Jur. 7, Chap. II; 32 Am.Jur. 49, § 26.

Since Kiker, having made his lease in 1941, later went upon the ground and paid the Bank rent instead of repudiating his lease (he testified that he entered under this lease; Supplemental Findings, pp. 21 to 24, inclusive) we see no reason why the Bank should not claim him for tenant. Whether any effect ought to be given such a tenancy against the plaintiff is a different matter and is really the question involved in plaintiff's claim of imposition and secret entry.

 2. An adverse possession can be interrupted by ouster, and thus it may be inferred that the conduct claimed by the owner to work an interruption of the possession must be such as would put an ordinary prudent person on notice that he actually had been ousted. Aside from this, it is the general rule that the owner can not interrupt an adverse possession secretly, by stealth. See: 2 C.J.S., Adverse Possession, 142(a) and (b), p. 704; 2 C.J. 96, § 118; 1 Am.Jur. 889, §§ 175, 176, and 177; 1 R.C.L. 723, § 39.

Kiker's entry and occupancy in 1942 (and after) was open and evident, of course, since the land in suit was farmed by him for months, and unless the circumstances of this case make an exception the plaintiff was bound to know, without notice from anybody, that the Bank might at any time elect to exercise any or all of its rights as owner; and the plaintiff's claim of imposition involves an extension of this rule about secret entry. In essence, as we think her

position to be, it is that if Kiker was a tenant of the Bank and entered and occupied the land in suit under his 1941 lease from the Bank, then Kiker's tenancy under the Bank ought to be treated as a disguise for the Bank and Kiker's entry under his lease ought to be treated as a secret entry, and his occupancy as a secret ouster, by the Bank because the plaintiff did not know of Kiker's lease from the Bank and assumed that Kiker was her own tenant.

Of course, this argument does not help the plaintiff, unless the Bank or Kiker ought to have told plaintiff about the Bank's lease to Kiker, that is, unless the Bank or Kiker owed plaintiff a duty to tell her of this lease which has some rational connection with the question, whether Kiker's occupancy ought to be treated as a secret entry by the Bank.

It is our conclusion that whether the Bank or Kiker owed plaintiff such a duty to tell her of the Bank's lease to Kiker depends on what the Bank or Kiker actually knew, not on some constructive knowledge which the operation of some rule of law charged upon them.

 And the single fact that plaintiff did not know of the Bank's lease to Kiker is not enough to give her the benefit of Kiker's occupancy; for as we stated, unless the facts of this case make an exception, the plaintiff was bound to know, without notice from any one, that the Bank might at any time elect to exercise its rights as owner.

 3. Since she claims benefit of the rule that entry in secret does not interrupt an adverse possession, the plaintiff had the burden of proof under said rule and was bound to show by a preponderance of the evidence that all facts existed on which the application of the rule depended. This was a matter of replication by her.

 4. At this point we come to an apparent conflict in application between two rules of law. One is that already stated, that a secret ouster will not interrupt an adverse possession. The other is, that:

ordinarily an adverse possession will not divest title unless it is such as gives notice that it exists and is adverse. Concerning this rule of decision see Roseborough v. Cook, 108 Tex. 364, 194 S.W. 131. Under the rule first stated plaintiff says that she ought not to lose because, she says, her ouster was secret and unknown to her. Under the second the Bank may say that it ought not to. lose because it had every reason to believe that it had a. tenant on the land in suit several times during the period of adverse possession which the plaintiff claims and, accordingly, that the adverse character of plaintiff's possession was concealed from it. The question raised is, whether under the facts of this case the Bank is to be penalized for Kiker's failure to tell the plaintiff about its lease to him, or, to put the question more precisely, whether the conduct of the owner's lessee shall have the same effect against the owner under the facts of this case as might be attached to conduct by the owner's agent. A lessee is not, of course, ordinarily the agent of the owner-lessor, and Kiker was not the agent of the Bank. He was, instead, only the grantee of an estate in land.

We have concluded, although with hesitation and doubt, that the difference between the capacities of agent and lessee is too great to justify our treating the entry and conduct of the one as legally equivalent to the entry and conduct of the other in considering the question of secret ouster, and that unless the owner-lessor is privy to misconduct by the lessee he will, at least ordinarily, not be affected by the lessee's conduct when the question of secret ouster arises. The owner-lessor ordinarily has no right to control the lessee (the Bank had no right to control Kiker), and to disregard the difference between agent and lessee when considering the question of secret ouster might permit a fraud to be worked on the land owner.

We hold that under the evidence, the Bank was not privy (or to state the matter most favorably to the plaintiff and in terms of the plaintiff's burden of proof, was at least not shown to be privy) to Kiker's failure to. tell plaintiff of his lease from the Bank or to any misconduct by Kiker toward plaintiff which concerned his entry into and occupancy of the land in suit or his relation to the Bank, if such misconduct there was (and we think that none was proved) and that the Bank never violated any duty toward the plaintiff, or, referring again to the burden of proof, was at least not shown to have violated any duty, and that for these reasons the plaintiff's ignorance of the Bank's lease to Kiker made in 1941 is immaterial and does not preclude the Bank from claiming advantage of Kiker's occupancy in 1942.

As for the Bank being privy of Kiker's conduct, all the Bank did with Kiker was to lease him the land and to accept its rent. There is no evidence that the Bank had any information about the agreement of 1938, nor was there evidence that the Bank knew or suspected Kiker of having farmed the land in suit in 1938. Pondrom did say, as we construe his testimony at S.F. 10 that he "had a pretty good idea" that Kiker was then farming on his mother-in-law's land; but we do not construe this testimony as showing that he knew or suspected that Kiker had been farming *the land in suit*; it seems rather to have been Pondrom's intention to say that he did not know Kiker had farmed the land in suit under the plaintiff. Further, Pondrom testified that when he made the first lease to Kiker in 1941, in behalf of the Bank, Kiker did not tell him that he proposed to make a lease with plaintiff for her own part of the land in the enclosure. (See S.F. 25) Still further, according to Pondrom and Peyton, the Bank did not actually know of plaintiff's adverse claim until shortly before the suit was filed in 1951. We note that Kiker said (S.F. 326) he did not tell the Bank of plaintiff's intention to claim the land, although he had learned of this in 1947, and Huffman said (S.F. 190) that he had not told the Bank of the declarations made to him. We said, in our opinion, that the Bank did not know of plaintiff's adverse claim until shortly before this action was filed, and plaintiff says that it was an issue of fact, whether the Bank had this knowledge, because the Bank's witnesses who testified on this matter were of-

ficers of the Bank. It may be that plaintiff is right here; but if the Bank's knowledge, or not, of plaintiff's adverse possession is material to plaintiff's claim of secret entry or imposition, then under the rules stated above, the plaintiff had the burden of proving that the Bank did have that knowledge when it made the lease to Kiker in 1941 and when Kiker farmed on the land in suit during 1942, and as we read the proof there is no affirmative evidence, circumstantial or otherwise, that the Bank had such knowledge. See pages 13, 14, and 15 of our supplemental findings in addition to matters already mentioned. Even though the jury had the right to disbelieve the Bank's officers the jury could not then, without affirmative evidence in addition, find that the Bank actually did have notice. Pondrom said that he had been down to the land as early as "about 1940", and he had seen a fence about the enclosure, and he knew the land in suit was in the enclosure, and the jury could have found that he saw the fence which plaintiff's witnesses said had been put up in 1938, two years or more before. However, this is not enough to support a finding that Pondrom had actual knowledge of the plaintiff's claim when he made the lease to Kiker in 1941, or when Kiker farmed in 1942, and it is the actual knowledge of the Bank's officers which is material to plaintiff's claim of imposition, disguise, and secrecy, not the constructive knowledge charged an owner under the statutes of adverse possession. The Bank and the plaintiff were not tenants in common and, if we put aside plaintiff's claiming advantage of an occupancy by one whom the Bank thought its own tenant, the plaintiff's adverse possession, if suitably evidenced on the ground, could have operated against the Bank even though the Bank never did have actual knowledge of the possession.

These comments also show that the Bank violated no duty to the plaintiff, or, to revert again to the burden of proof, serve at least to show that no duty was proved.

Our conclusion requires that the motion for rehearing be overruled. The motion has assigned error to our rendering judgment instead of remanding the cause, on the ground that the evidence was not fully developed; but we think the evidence pertaining to the Bank's connection with Kiker and his conduct toward the plaintiff has been developed so far as to show that a retrial would add nothing to it and thus this evidence, which we think controlling, may be said to have been fully developed.

5. However, even if we were to hold that when one who has a lease from the owner enters secretly or by imposition upon the adverse claimant, this entry ought to be given the same effect as a like entry by the owner himself or by the owner's agent, we are still of the opinion that plaintiff failed to prove her case.

We proceed first to a consideration of some parts of the evidence.

Plaintiff argues that the leases from the Bank to Kiker were secret. Plaintiff testified that she had not known of them, and some other witnesses, friends of Kiker, said they had not; but there is no evidence that information about the leases was deliberately suppressed and there is some evidence that it was not suppressed. See p. 23 of our supplemental findings.

In our opinion we stated that Kiker first learned of plaintiff's adverse claim in 1947. This conclusion was based on Kiker's testimony, and plaintiff says that Kiker's testimony only raised an issue of fact for the jury because he was an interested witness, having made an agreement in 1950 or 1951 with the Bank, prior to the filing of this suit, to purchase the land (or, according to Peyton, the surface: S.F. 73) and there is evidence (See S.F. 7, 8; 302) that the agreement is still in force, to be performed if the Bank wins this suit. So, it may be said that Kiker was interested in seeing that plaintiff lost the suit and plaintiff, in fact, now argues that Kiker is her real adversary and the true defendant. In addition to pointing out Kiker's interest the plaintiff also argues that Kiker was charged with knowledge of her adverse claim by circumstances.

We will first consider the argument that Kiker was charged with knowledge of

plaintiff's adverse claim when he dealt with the Bank. If it be meant that this information was charged by law, then the notice given would be constructive, not actual, and as we have stated, we think that only actual knowledge counts on plaintiff's claim of a secret entry.

Then, will the circumstances in proof support a finding that Kiker actually did know or suspect when he took his lease from the Bank in 1941 or when he farmed the land in suit in 1942, that plaintiff claimed the land adversely? Kiker testified that he first learned of plaintiff's adverse claim, or of her intent to claim the land, from plaintiff's son, Rube Wingate, and the evidence is that this occurred in 1947 or later. In our original opinion we accepted this as true. Did this testimony, considered with the other circumstances, including Kiker's agreement for the purchase of the land in suit, only raise an issue of fact for the jury?

The circumstances to which we referred may be summarized in plaintiff's favor as follows: Kiker joined in plaintiff's deed of 1937 to the Bank and it may be assumed that he knew, from this time, that the Bank owned the land in suit. In 1938, he made an oral agreement with the plaintiff that he might farm in rice all of the land in the enclosure which could be farmed for that purpose. This agreement was to continue as long as he wished. He did grow a rice crop in the enclosure in 1938 under this agreement and cultivated some of the land in suit. This was done under the said agreement and he was the plaintiff's tenant. It was also in 1938 that plaintiff restored the fence about the enclosure; and Kiker participated in this for plaintiff; he knew of this work and what had been done. After he concluded his 1938 farming operations, Kiker told plaintiff that he wanted to let the land in the enclosure lie fallow, and he left the land and farmed elsewhere until 1942. He intended to return to the enclosure and to farm there. During the interval between his 1938 and his 1942 farming operations in the enclosure, which covered a little more than three years, plaintiff kept cattle in the enclosure. Ki-

ker may, or may not (see p. 161 Supp. Find.) have had some of his own cattle in there; but it may be inferred that he knew during this three year period what plaintiff was using the enclosure for. He may, or may not (we cannot say) have known of Christ's cultivation of the small area, described at p. 84 of our supplemental findings. According to Kiker's testimony, one of his reasons for taking the lease from the Bank in 1941 was that the agency furnishing water for irrigation required this to be done.

These are circumstances which plaintiff would emphasize under the rule of decision hereinafter quoted, as showing the plaintiff's possession and use of the land in suit and Kiker's knowledge of this possession and use; but there are other circumstances which must be considered, too. Thus, it was open to Kiker to see, and he had been acquainted with the land for many years before 1941, that the plaintiff owned or rightfully controlled most of the land in the enclosure and had good reasons of expense and convenience for maintaining the enclosure and not separating the Bank's land from that she owned or leased. This circumstance is to be considered with the fencing work done in 1938 and later. Further, when she decided to claim the land the plaintiff told no one about her intention except her two sons, Rube and Hal Wingate, and there is no evidence that she ever told any one else. The evidence is that she never had told Kiker of this intention. See pp. 11 et seq. of our supplemental findings of fact. The only declarations to third persons about the plaintiff's claim which were proved was that to which Kiker himself testified, unless we are to count that made to Huffman, and this seems to have been more an expression of an intention to claim some defect in the Bank's title than to claim adversely. See pp. 13 and 14 of our supplemental findings. Further, the plaintiff had not rendered the land for taxation or paid taxes levied on it. See pp. 218, 213 and 214, 217 to 221, inclusive, of the statement of facts. Further, although plaintiff and her sons Rube and Hal Wingate testified

and presumably would have some information about the matter, Kiker's testimony concerning his first information of plaintiff's claim was not contradicted or the subject matter of this testimony discussed by any other witness. The plaintiff seems to have relied on her conduct respecting the land to notify the world of her intentions; and there was something about it suggesting secrecy, a desire not to have it widely known; and in our supplemental findings (p. 11) we expressed this characteristic of plaintiff's claim in the following words: "The plaintiff's claim of adverse possession seems not to have been advertised, although it was not suppressed."

In support of her position that Kiker was charged with knowledge of her claim, the plaintiff seems to rely on a rule of circumstantial evidence much used in actions in which a claim of title by adverse possession is asserted against one claiming to be the owner. This rule sometimes, though not invariably, treats possession and use for the statutory period as being circumstantial evidence of adverse claim, as well as being proof of compliance with other requirements of the statute. Justice Williams stated the rule as follows in Hartman v. Huntington, 11 Tex.Civ.App., 32 S.W. 562 at page 563: "Ordinarily, when a person in possession of land is shown to have used and enjoyed it as owners of lands usually do, the natural inference is that his possession was taken and held for himself as owner, and that it was 'therefore inconsistent with and hostile to the claim of another.' This inference prevails unless something else is shown to qualify and explain the possession." The court then held that other evidence had rebutted the inference of claim by showing the occupant's intent in beginning his possession. Other sorts of circumstances were held to rebut this inference of claim in the following cases: McKee v. Stewart, 139 Tex. 260, 162 S.W.2d 948; Gilbert v. Green, Tex.Sup., 242 S.W.2d 879; Boy v. McDowell, Tex.Civ.App., 207 S.W. 937. None of these decisions involves the questions we are considering nor does any other which we have seen; but the decisions just cited do show that whether an inference of adverse claim ought to be drawn from possession and use depends upon the circumstances of the particular case.

We are not satisfied that this rule of decision ought to be applied to this case, where we are concerned with actual knowledge, but regardless of this, it must be said of the case under review and in reference to the rule of decision just stated, that possession has different meanings according to what the person observing it knows. A stranger, not knowing the facts, might well have thought the plaintiff the owner; and the Bank, knowing that plaintiff had no authority to use the land and learning of plaintiff's conduct might (subject to the rule about a vendor remaining in possession which the Bank invoked) have suspected that plaintiff intended a claim. But at the time of his lease in 1941 and in 1942 Kiker was neither in the position of the stranger nor in that of the owner. He knew (we are using the summary of proof favorable to the plaintiff which has been made above) that the plaintiff was not the owner and he also knew that plaintiff had assumed to restore the fence around the enclosure and had used the land, once for farming in rice and then for three years as pasture for cattle. This covered only about four years before his entry in 1942; and it was not enough to satisfy the five or the ten year statutes of adverse possession. From this he might have drawn the inference that plaintiff assumed to exercise a *right;* but could he say what kind of a right this was? The plaintiff might have had authority to do what she had done, or she might also have intended no claim at all; either was a possibility. A part of her conduct, namely, the restoration of the fence and the pasturage for cattle, if considered alone, would particularly exhibit this ambiguity because the land in suit divides the enclosure and it would have been expensive and inconvenient for plaintiff to have separated her land and that she leased from the land in suit. See p. 6 and pp. 2 and 3 of our supplemental findings. The fact that plaintiff had assumed in 1938

to lease for farming all of the land in the enclosure which could be cultivated in rice, and to continue this arrangement for an indefinite time, is not so uncertain in implication as the restoration of the fence and the use for pasturage; but could the jury say that, knowing this and acting on it, Kiker knew or actually had in mind a suspicion that plaintiff, so soon after her deed to the Bank, had decided to reacquire title by adverse possession? Or, if not in 1938, then in 1941 or 1942? Adding together both sorts of use by the plaintiff over the period of about four years before Kiker's entry in 1942, we have to consider the element of secrecy attaching to plaintiff's claim, and there is another matter which is relevant: Kiker owned no interest in the land in suit and was not concerned with whether the plaintiff claimed it adversely. Protection of his own interests did require him to learn whether his landlord, if the plaintiff, had authority to lease the land in suit to him (whether he did or not we cannot say) but it did not require him to go further and find out whether plaintiff also intended to claim the land adversely, that is, whether the plaintiff intended to reacquire title to the land by adverse possession.

The question is whether the jury could have found that Kiker *actually* knew or had in mind the suspicion, when he took his first lease from the Bank in the latter part of 1941 or when he farmed the land in suit in 1942, that plaintiff was claiming the land adversely to the Bank. Kiker's testimony puts his first information about this claim in 1947 or later, and he was not contradicted. The only evidence which might prove that he was wrong and did have this knowledge in 1941 and 1942 consists wholly of circumstances. It is our conclusion, bearing in mind Kiker's own testimony and the absence of contradiction, the fact that plaintiff's conduct need not have been hostile to the Bank, the element of secrecy attaching to plaintiff's claim, and the fact that Kiker was not concerned with whether plaintiff claimed the land, that the evidence would not support a finding that he

did have the actual knowledge or suspicion mentioned at the times stated.

Because of this conclusion it is not material whether Kiker's testimony concerning the time he first learned of plaintiff's claim only raised a question for the jury or not, for the burden of proof was on the plaintiff and if the jury could disbelieve Kiker, then there was no affirmative evidence to show when Kiker really *did* find out about her claim. But we have not changed our opinion that Kiker's testimony as to when he first learned of plaintiff's adverse claim may be accepted as true. This opinion was based on the secrecy accompanying the plaintiff's claim and on the absence of any contradiction of Kiker, although persons testified who could, presumably, have given information about Kiker's knowledge of plaintiff's claim or lack of it; and these circumstances support Kiker's testimony.

In our opinion we adopted as true Kiker's statements that he did not pay two rents, that is, that he paid the Bank rent for that part of the land in suit which he used and paid the plaintiff rent for her land. We adhere to our conclusion for the reasons given in our supplemental findings; there are some circumstances which support it. See pp. 25, 26 and 27 of our supplemental findings. And all plaintiff testified was that Kiker told her he was paying her for her "rice ground". I do not see that Gilmore's actions subtract anything from Kiker's testimony about what he did, himself.

(6) Having discussed some elements of the proof let us now consider as a whole the evidence on which plaintiff must depend to raise an issue for the jury, whether Kiker's occupancy of the land in suit, or that part of it he farmed in rice in 1942 represented an imposition on plaintiff or a secret, that is, concealed or disguised entry by him. This evidence may be summarized in plaintiff's favor as follows:

Kiker is plaintiff's son-in-law.

Kiker has known since the plaintiff's deed of 1937 to the Bank that the Bank had the title to the land.

In 1938, the plaintiff made an agreement with Kiker that he might farm the land in the enclosure in rice, and Kiker did farm in the enclosure in 1938, under this agreement and as the plaintiff's tenant. The authority conferred by the agreement extended to all the land in the enclosure and Kiker farmed on the land in suit in 1938. This agreement was to continue as long as Kiker, and of course, the plaintiff, wished. Since 1938 the plaintiff has regarded this agreement as being in force and has refused requests by one of her sons to be substituted for Kiker. According to plaintiff this is the only agreement she made with Kiker.

Also in 1938 the work was done on the fence which is described in our opinion and supplemental findings, and Kiker participated in this work.

After his farming operations for 1938, Kiker told the plaintiff that he wanted to let the land in the enclosure lie fallow, and he removed his farming operations to another area and did not farm in the enclosure again until 1942, more than three years later. Plaintiff in the meantime had cattle in the enclosure and Kiker may, or may not (see p. 161 Supp.Find.) have had some of his own in there. At any rate, Kiker must have known that Plaintiff had some cattle in the enclosure. He also must have known that plaintiff owned or rightfully controlled most of the land in the enclosure and had ground for not separating her land from the Bank's.

In the latter part of 1941, the Bank leased to Kiker for farming in 1942 that part of its land in the enclosure which the parties thought to be cultivable in rice, and Kiker did farm this land in 1942 and paid the Bank for the use of this land the rent which was reserved in the lease.

Kiker did not tell the plaintiff of this lease from the Bank and plaintiff did not know of it while Kiker was farming in the enclosure in 1942. From this and from some general statements by plaintiff as to Kiker having kept the "lease", that is, the agreement of 1938, and that "it" had been leased ever since the fencing (S.F. 202, 203) it may be inferred that plaintiff assumed Kiker to be her tenant of all the land he was farming in the enclosure. See p. 27, Supp.Find. This is all we meant by the following statement in our opinion: "We assume that this evidence raised an issue for the jury, whether the plaintiff knew that Kiker intended to pay her rent only for her own property.". Kiker actually testified on deposition that he told plaintiff he was paying her rent for her land. (S.F. 318, 319): and it is not clear to us that this testimony at S.F. 332 and 333 contradicts these statements.

However, information about this lease from the Bank was not suppressed and Kiker made no misrepresentations to the plaintiff about it.

There is no evidence, except plaintiff's adverse claim, as to what plaintiff would have done had she known of Kiker's leases from the Bank.

In 1942 Kiker also farmed plaintiff's land in the enclosure and he did this under his 1938 agreement with the plaintiff. This is all his testimony at S.F. 331 and 332 means. He paid the plaintiff rent for this land, not for the Bank's land, and he did not tell plaintiff that he was paying her for the Bank's land. Instead, he told her that he was paying her for her "rice ground"—that is, her own land. (p. 30 Supp.Find.). It may be inferred that plaintiff did not then know that Kiker paid the Bank rent since she did not know of the Bank's lease, but she lived on the land and she and her sons, who lived near by her (p. 3 Supp.Find.) had Kiker's cultivation before them and they could have quickly and easily determined whether Kiker had paid plaintiff the right rent had they been minded so to do. These circumstances bear on Kiker's good faith. On the other hand, Kiker was plaintiff's son-in-law, and this fact would normally affect the sort of inquiry plaintiff might make. It would also normally affect the

952

truth of statements Kiker might make to her and the good faith he might bear toward her.

Under plaintiff's theory of the facts, the evidence does not show how Kiker got into the enclosure in 1942 or when he made his arrangement to do so. On deposition Kiker said that he had made separate agreements with the plaintiff and with the Bank for the use of the land owned by each, for the year 1942 and for the years afterward when he farmed in the enclosure, and he never did contradict this testimony. However, plaintiff testified that only one agreement was made between her and Kiker, and this was the agreement of 1938. Obviously, Kiker had to make some kind of an arrangement to get into the enclosure if cattle were in the enclosure (See p. 34, Supp.Find.) but, as we have stated, the evidence does not show when and how this was done.

The evidence will not support an affirmative finding that either the Bank or Kiker had actual knowledge of plaintiff's adverse claim or suspected this when the Bank made the lease to Kiker in 1941 or when Kiker farmed the land in 1942. We think that Kiker's statements showing that he did not know of the claim at that time ought to be taken as true, but it is not material whether this be done or not.

There is nothing to show that the Bank ever knew of the 1938 agreement between Kiker and plaintiff before the present controversy arose, and no circumstance is in proof which would charge the Bank with knowledge of that agreement. Pondrom testified that Kiker did not tell him of the intention to lease land in the enclosure from plaintiff.

Under our conclusion that plaintiff had the burden of proof to show that if Kiker be regarded as the Bank's tenant then Kiker's entry and occupancy in 1942 was a disguise for the Bank and the Bank's entry and occupancy would, in effect, be secret, the plaintiff failed to raise an issue for the jury that anything of the sort had happened. The theory of entry by stealth wholly depends on the fact that Kiker did not tell plaintiff of his 1941 lease from the Bank (we are not considering the period after 1942); and the Bank had nothing to do with this. And, since there is nothing to show that the Bank knew about that 1938 agreement between plaintiff and Kiker and for the reasons stated in Section 4 of the opinion, there is no reason for charging the Bank with the burden of notifying plaintiff about the lease of 1941, if under any circumstance the Bank might be so obligated. Kiker's case is different because of his close relation to plaintiff (son-in-law) and because of his 1938 agreement with her. If Kiker was under a duty to tell the plaintiff of his lease from the Bank then the plaintiff might claim that she had been imposed upon by Kiker in not telling her of the lease. Did Kiker owe plaintiff such a duty? Let us consider first only the agreement. This did not make Kiker plaintiff's tenant while he was out of possession and it would not raise, alone and of itself, any *estoppel* against Kiker. It was not a contract and did not bind Kiker, but perhaps it did put him under some kind of a duty, under some circumstances, of giving plaintiff notice that he would no longer act under it. This, however, would be an incident of its nature as an agreement which was to continue indefinitely and would not be a consequence of the fact that if plaintiff was not told about the lease from the Bank she would be injured in her rights as an adverse claimant. That is, the consequences to be expected from a simple failure to notify plaintiff of termination would be such as might be predicted from a simple breach of contract—unless, of course, Kiker knew or had in mind the suspicion that plaintiff was an adverse claimant. How could plaintiff be injured by Kiker's limiting his performance of the 1938 agreement to land plaintiff owned or leased? We do not see that such a duty to notify plaintiff of termination, or the consequences of its breach, has any connection with the question, whether Kiker's occupancy under the Bank's lease ought to be treated as a secret ouster.

Let us consider next the question of good faith between Kiker and plaintiff, apart from any question of breach of contract. Did such good faith require Kiker to tell plaintiff of his 1941 lease from the Bank? Did he act in bad faith in not telling her? It seems to us that no question of such good faith could arise unless Kiker knew or suspected that his failure to disclose this information to plaintiff would do her some injury or be in conflict with some right she had. As for the right to occupy, that was his; he had a lease from the owner, and the rent he would pay the Bank was no loss to plaintiff because she was not entitled to it. What other right could plaintiff have had? Unless he knew or suspected that plaintiff had an adverse claim to the land there was no reason for Kiker to think that information about the lease from the Bank was material to plaintiff's rights or any concern of hers; and it seems to us that if Kiker did not know of plaintiff's adverse claim or suspect its existence, he owed plaintiff no duty of good faith to tell her of the lease, because the lease was something which otherwise did not concern her. The Bank owned the land and had the power to and the right to lease it, and Kiker, being out of possession and thus *not* then being the tenant of plaintiff, had the right to take a lease on the land in suit from the Bank, and having done so, had a right to enter upon the land and farm it. Neither by contract nor by estoppel was he barred from doing this. We think that Kiker did not know of plaintiff's adverse claim when he farmed the land in 1942, and it seems an unusual sort of imposition for him to attempt on his mother-in-law by farming operations which necessarily extended over months and, in effect, were done and carried on before the eyes of plaintiff and her sons, and when the rent which Kiker paid the Bank instead of the plaintiff was a material addition (one which would ordinarily have been missed) to the rent he paid the plaintiff. However, the plaintiff, not the Bank, had the burden on this claim of secret entry and imposition and, so, we think, had to show that Kiker knew of

her adverse claim or suspected the same, and we think that she failed to do so.

Why, then, did Kiker fail to tell plaintiff about the 1941 lease from the Bank? Did he fear that she would bar his entry into the enclosure? That she would terminate her oral agreement with him? Can bad faith from this fact alone be inferred? We think that the evidence does not show *why* Kiker failed to tell the plaintiff about the lease; he may as well not have done so because he thought it no concern of plaintiff's as that he wished to take advantage of plaintiff. The inference of bad faith from his failure to tell plaintiff amounts to no more than a suspicion; at most, it does not exceed the scintilla held insufficient in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059.

On page 5 of her argument in support of her motion for rehearing plaintiff has directed our attention to evidence at page 300 of the Statement of Facts which shows that Kiker was to pay plaintiff $3 an acre, canal survey, as rental for the land which he farmed in 1938. We accordingly withdraw the statement on page 25 of our supplemental findings that "we infer that he paid some rent." We adhere to the statement accompanying that, corrected, that "there is no evidence as to the amount of the rent paid the plaintiff in 1938 by Kiker."

We do not agree with plaintiff that Kiker's testimony at S.F. 300 shows that he had agreed to pay (and that plaintiff had agreed to accept) a future rental of $3 an acre. As we construe the evidence concerning the oral agreement of 1938 between plaintiff and Kiker, it was the intention of the parties to give Kiker no more than a preference and to bind the plaintiff no further. We think that she was free to demand more rental if she wished, just as we think Kiker was free to farm only so much of the land as he wished or was free to terminate the agreement when he wished.

In paragraph No. 11 of the motion for rehearing plaintiff has assigned error to

the sentence stating that "judgment for title and possession must be rendered in behalf of the defendant bank and against plaintiff" for the reason that such relief was not prayed for. Plaintiff is correct and the quoted statement is withdrawn; but the concluding paragraph of our opinion states that judgment was rendered that plaintiff take nothing against the defendant, and the correction which we have made is immaterial to the appeal.

The motion for rehearing is overruled.