**WEST END API, LTD. and Alldeal, Inc., N.V., Appellants,**

**v.**

**John K. ROTHPLETZ and Max D. Chapman, Appellees.**

**No. 05–86–00207–CV.**

Court of Appeals of Texas, Dallas.

May 7, 1987.

Rehearing Denied June 10, 1987.

Robert H. Mow, Jr., Allan B. Diamond, Emily McKillip, Dallas, for appellants.

Paul S. Adams, Jr., B. Michale Bennett, Dallas, for appellees.

Before WHITHAM, HOWELL and JAMES[1], JJ.

HOWELL, Justice.

This is an action of trespass to try title concerning a short segment of an abandoned railroad right of way (the strip) through an industrial area of Dallas. The parties are the abutting owners on either side of the strip. The plaintiffs, appellants here, West End API, Ltd. and Alldeal, Inc.

---

1. The Honorable John A. James, Jr., Justice, retired, Texas Court of Appeals, Waco, sitting by assignment.

N.V. (Owners) [2] were at all times owners of the property abutting the east side of the strip. The defendants-appellees, John K. Rothpletz and Max D. Chapman, Trustees (Claimants) were the owners on the west side. Following a bench trial, the court below entered judgment for Claimants. In three points of error, Owners contend that the trial court erred in holding that Claimants had exclusive possession of the strip, that the doctrine of ouster was applicable, and that the Claimants hostilely possessed the strip long enough to acquire title by limitation. We affirm.

Owners brought suit in 1984. Both parties relied on certain conveyances to establish at least a partial chain of title and each party challenged the opponents' claim of title by conveyance.[3] In 1985 the trial court granted partial summary judgment establishing the validity of Owners claim of title by conveyance. Owners make no complaint of this ruling inasmuch as they were the beneficiaries thereof. The partial summary judgment cast the burden of proof upon defendant Claimants with respect to their claim of adverse possession. After hearing the evidence, the trial court held that Claimants had indeed carried that burden and rendered judgment in their favor.

The nature of Owners' points of error has a direct bearing on the outcome of this appeal; therefore, we quote the full text thereof:

> ... [1] The district court erred in ruling that.... [Claimants met their] burden of proving conclusively that [that] had exclusive possession of the strip for the requisite adverse possession limitations period.
>
> ... [2] The district court erred in ruling that the doctrine ouster was applicable.
>
> ... [3] The district court erred in ruling that .. [Claimants met their burden] of proving conclusively that [they] had hostile possession of the strip for the requisite adverse possession limitations period.

It is plain that Owners' points are not artfully drawn in that they do not enlighten the court whether appellants are complaining of legal or factual insufficiency of the evidence. In prior years, when a point failed to specify whether a legal or factual challenge was being made, the point would be treated as a legal insufficiency or "no evidence" complaint. *E.g., Chemical Cleaning Inc. v. Chemical Cleaning & Equipment Service, Inc.,* 462 S.W.2d 276 (Tex.1970). However, in *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 632–33 (Tex.1986), the supreme court overruled *Chemical Cleaning* in light of the supporting argument to ascertain the party's complaint. In the present case, such analysis is of little avail.

In the argument under their points, Owners have asserted both that no evidence supported the trial court's findings and the "great weight and preponderance of the evidence" was contrary to the judgment. While Owners' arguments appear to raise both contentions, we need only address the question of legal sufficiency because Owners have only prayed for a rendition of judgment with respect to the recovery of title to the strip. Under the circumstances, we hold that Owners are limited to the relief asked by their prayer:

> For the foregoing reasons, [Owners] pray that this Court REVERSE the judgment of the court below, render judgment declaring that full legal and equitable title to the Strip is vested in Appellants, and remand the case to the District Court for findings of fact and conclusions of law on Appellants' right to damages, attorneys' fees, and cost of court.

Much has been written concerning the distinction between factual insufficiency points of error and legal insufficiency points of error and legal insufficiency points. *See generally,* Garwood, *The Question of Insufficient Evidence on Appeal,* 30 Tex.L.Rev. 803 (1952), Calvert,

---

**2.** The names "Owners" and "Claimants" have been employed for convenience even though we recognize that they are far less than completely descriptive.

**3.** We expressly do not reach or pass upon Claimant's cross-point urging that the partial summary judgment was erroneously decided.

*"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.Rev. 361 (1960). It was customary in the older cases to present factual insufficiency points by alleging that a particular finding was contrary to the "great weight and preponderance of the evidence" or to employ equivalent language. A legal sufficiency point was commonly represented by stating that there was "no evidence" to support a particular ruling. There are many possible variations and distinctions that may be drawn between the two tests, but there are two distinctions that are both stark and fundamental.

Factual insufficiency points of error are addressed to the peculiar power of the court of appeals to weigh all of the evidence and to grant new trials where the disparity between the evidence and the finding is so contrary to the weight of the evidence as to be manifestly unjust or to indicate prejudice. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1952). On the other hand, a legal insufficiency point of error requires that the appellate court look only at the evidence in support of the judgment; it must disregard all evidence in favor of the complaining party unless that evidence is uncontroverted. After reviewing the evidence pursuant to this test, if the appellate court agrees that the evidence is legally insufficient to support the finding, the usual remedy is to reverse and render in favor of the complaining party. *National Life & Accident Insurance Co., v. Blagg,* 438 S.W.2d 905, 909 (Tex.1969); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

What can be better established than the proposition that relief that has not been prayed cannot be granted? Owners have given no indication anywhere in their briefs that they desire a new trial of the adverse possession claim. They only ask that we render judgment in their favor. We are mindful that the briefing rules must be liberally construed so as to do substantial justice. Nevertheless, we must limit Owners to the relief prayed. *Cf. Texas Prudential Insurance Co. v. Dillard,* 158 Tex. 15, 307 S.W.2d 242, 252 (1957) (treating

ambiguous insufficiency point as complaining only of "no evidence" where the party only requested reversal and rendition). We have examined the evidence only for legal insufficiency and find some probative evidence supporting the trial court's findings. Owners' pointed will, therefore, be overruled.

For many years, Owners' property had been improved by a three story brick industrial building with one of its walls contiguous with the boundary of the strip. In 1972, the railroad, after a number of years of non-use, issued a quitclaim deed to Jayson, the owner of the abutting tract on Claimants' side of the strip—Claimants' predecessor in title. However, the record is fairly clear that the railroad only held title to an easement. It is doubtful it could have conveyed any greater estate. Owners have asserted legal title to the reversion and the partial summary judgment sustained that claim. Nevertheless, following the railroad's deed, Jayson proceeded to use the strip in conjunction with his abutting tract on the west. The abutting building on claimants side was torn down. A parking lot was created that was composed of the strip plus a portion of Claimants' immediately abutting premises.

At the trial Claimants relied in part upon the five-year statute of limitations which provides:

(a) A person must bring suit not later than five years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who:

(1) cultivates, uses, or enjoys the property;

(2) pays applicable taxes on the property; and

(3) claims the property under a duly registered deed.

Tex.Civ.Prac. and Rem. Code Ann. § 16.025 (Vernon 1986) (formerly article 5509). Thus, in order to acquire title to land under the five year statute, it was necessary for Claimants to prove three elements: (1) adverse possession; (2) payment of taxes; and (3) claiming under a deed or deeds duly registered. *Jackson v. Heath,* 325 S.W.2d

453, 454 (Tex.Civ.App.—San Antonio 1959, no writ).

At trial, it was undisputed that Claimants had asserted title to the strip, at least from the time of the receipt of a warranty deed from their predecessor, Jayson, which was recorded on June 2, 1978. Although the deed may have attempted to convey a greater interest than Jayson actually owned, the defect, if any, was not apparent from the face of the instrument. Thus, recording of the deed was sufficient to satisfy the third requirement of the test. "[I]t is not necessary that the deed under which the claim is made convey any title. The grantor may be wholly barren of any vestige of title; the deed may therefore pass no semblance of title; yet, if it describes and purports to convey the land and tested by itself is upon its face a good deed, it meets the requirement". *Jackson,* 325 S.W.2d at 454–55 (*quoting Roseborough v. Cook,* 108 Tex. 364, 194 S.W. 131, 132 (1917) (emphasis omitted)).

At trial, it was also undisputed that Claimants had paid taxes on the strip commencing with the year 1978 and that, such taxes had all been timely paid. Owners, therefore, also satisfied the second requirement of the five year statute. We are reduced to the question of whether Claimants satisfied their burden of proving that they adversely possessed the strip during those years.

To establish title by adverse possession, Claimants were burdened to show that they had actually and visibly held real property, under a claim of right inconsistent with, and hostile to, the claim of another. *See* Tex.Civ.Prac. & Rem.Code Ann. § 16.021(1) (Vernon 1986). The possession of an adverse claimant must be exclusive of the true owner, and any joint or common possession by the claimant and the owner defeats the requisite quality of exclusiveness. *Rick v. Grubbs,* 147 Tex. 267, 214 S.W.2d 925, 927 (1948).

We interpret point one to assert that there was no evidence from which the trial court could legitimately have held that any possession of the strip by Claimants during the years 1978–1984 was exclusive of any possession by Owners.

In reviewing a no evidence point of error, this court must consider only the evidence and inferences tending to support the trial court's judgment and disregard all evidence and inferences to the contrary. *Garza,* 395 S.W.2d at 823; *In re King's Estate,* 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951).

The evidence was undisputed that Claimants began improving the strip immediately after taking possession. Claimants removed railroad tracks from the strip, graded and paved the strip, painted stripes on the asphalt, built a retaining wall, and began using the strip in connection with part of their abutting premises as a parking lot. Claimants eventually painted the names of tenants on the parking spaces and posted signs the unauthorized cars would be towed away. They presented evidence that unauthorized cars were, in fact, towed away, including cars which belonged to customers visiting Owners' building.

The evidence was also undisputed however, that as early as 1972, drain pipes and vents from Owner's building led onto the strip where they had outlets and that a door from that building let out onto the strip. Owners argue that because they used the strip for draining, ventilating, and exiting their building, Claimants failed to prove that their possession of the strip was exclusive. We disagree.

Reviewing only the evidence supporting the trial court's judgment and disregarding all evidence and inferences to the contrary, the evidence showed that in 1978, while Claimants were paving the strip, the drains from Owner's building were extended so that water draining from the building ran under the pavement and into the street, rather than running onto the strip. Thus, Claimants' presented some evidence that there was no drainage onto their strip from Owners' building after 1978.

Evidence also showed that vents from the building onto the strip exhausted paint and glue used in a manufacturing process conducted in the building. However, one of Owners' former tenants testified that after Claimants' tenants complained of

glue particles falling on cars parked on the strip, "we had a buffer built on the bottom so it would go directly straight down against the building and not go into the parking lot." In addition, a witness for claimants testified that, in 1977, the paint vent was directed toward the south of Owners' building onto other adjacent property of Owners, rather than toward the strip. Thus, there was some evidence that Owners did not use the strip for ventilation after 1977.

In addition, Claimants presented some evidence that the door which opened onto the strip was never used for entering and exiting the Owners' building. A tenant of that building testified that "we never used [the door] to come in and out of the building, but I knew it had to be there for us to get out of the building in case of a fire."

Claimants' witnesses testified, that one of his tenants blocked the door "every day for six years" and that because "Mr. Braden's bumper went right up against the wall; it would have been impossible to open that door." Claimants' witness also testified that the door which opened onto the strip was not installed until 1984 and that "we always thought" that the door on the building which was there from 1977 until 1984 "opened inside." Thus, Claimants presented some evidence from which the trial court could have concluded that the door in place during the five year period was not constructed so as to open onto the strip and in any event, was not opened.

Owners further rely on evidence that the building was equipped with a fire sprinkler system that was tested four times during the period in which Claimants allegedly perfected limitations title. Thomas Duke, a former employee of the Fire Prevention and Engineering Bureau of Texas, testified that the system was inspected in 1979, 1980, 1982, and 1983. Duke testified that he performed the 1980 test, that he did not know who performed the 1979 test, and that he was not sure who performed the 1982 test. The record is silent regarding who performed the 1983 test. Duke testified that in testing the fire sprinkler system, the main drain valve was opened and the pressure of the water flowing from the drain onto the strip was measured. Duke testified that water flowed from the drain for two to five minutes and covered approximately sixty-five percent of the strip. Owners argue that this evidence established that they used the strip thus defeating Claimant's claim of exclusive use of the lot. We disagree.

Because Duke only had personal knowledge of the test conducted in 1980, the trial court could have concluded that only once during the five year period between 1978 and 1983 did water flow from the fire sprinkler drain. Moreover, Claimants' witness viewed a picture of the fire sprinkler test taken in 1985, which Duke testified accurately portrayed how the strip was flooded during the test. Claimants' witness testified that he had "never seen water like that" portrayed in the picture. In addition, Duke testified that the 1985 test, during which the pictures were taken, was performed on Sunday, although that was not routine, because "we arranged to meet on … Saturday.… and there were several cars parked right up very close to this drain and I did not want the liability of flowing rusty goopy water onto somebody's car.…" The trial court, as the sole judge of the credibility of the witnesses was free to disbelieve Duke's testimony and to believe Claimant's suggestion that such a test never occurred. Owner's first point of error is overruled.

■ Similarly, we interpret point three to assert that there was no evidence from which the trial court could legitimately have held that any possession of the strip by Claimants during the years 1978–1984 was *hostile* to any possession by Owners. Owners argue that, because Giller, their predecessor in title, testified that he warned Claimants' predecessor, Jayson not to "interfere with the fire exit door or anything else that we have out there," and because Giller testified that he would not have permitted cars parked on the strip to block the fire exit door, Claimants failed to show that their possession of the strip was hostile, rather than permissive. We disagree. We first note that this episode did

not involve Claimants and did not occur during their asserted five-year adverse possession period allegedly occurring during years, 1978–1984. The record also reflects that on cross-examination, Giller conceded that he never claimed to anyone that he owned the strip. Jayson testified that in 1972, he told Giller that he had leased the strip to a restaurant for use as a parking lot, that Giller never objected to Jayson's use of the strip.

In addition, it is undisputed that in 1984, Owners requested Claimants' permission to use Claimants' parking lot during the renovation of the Owners building. As pointed out, the strip is a significant component of that parking lot. The parties signed a letter agreement in which Owners agreed to permit Claimants' tenants to park in another lot owned by Owners. The letter required Owners to remove trash and debris and to repair any damage done. Accordingly, Claimants presented some evidence that their possession of the strip was not permissive as to Owners, but instead was hostile to any claim of ownership by Owners. We overrule the third point of error.

 Point two complains that the trial court erred in ruling that the doctrine of ouster was applicable. We are not directed to any particular ruling or to any specific place in the record. Neither do Owners explain what acts they rely upon to constitute an ouster. We fail to comprehend now ouster is applicable. Once adverse possession commences, the holder or legal title may interrupted that possession and prevent the possessor from maturing his claim, either by (1) filing suit or (2) by ouster. It is settled that an ouster need not be complete. It is sufficient if it interrupts the *exclusivity* of the holding by the adverse possessor.

 It is equally well settled that "to constitute an interruption of an occupant's adverse possession, an entry by the owner ... must clearly indicate that the occupant's possession is invalid and his right challenged. It must be open and notorious and bear on its face an unequivocal intention to take possession. It cannot be accidental, casual, secret, or permissive." *Kirby Lumber Corp. v. Smith*, 305 S.W.2d 829, 830 (Tex.Civ.App.—Beaumont 1957, writ dism'd). The conduct relied upon by an owner as constituting an interruption of the adverse party's possession must be such that it would put an ordinary person on notice that he actually has been ousted. *American National Bank of Beaumont v. Wingate*, 266 S.W.2d 934, 945 (Tex.Civ.App.—Beaumont 1953, writ ref'd n.r.e.). In the present case, assuming *arguendo* that Claimants once gained exclusive possession for a substantial enough period of time to support an assertion of ownership and further assuming that Owners thereafter commenced a use of the property for draining, ventilating, and exiting their building on sparse occasions, such uses were not sufficient to put claimant on notice that they had been ousted from possession of the strip because these acts were not of a nature such as to clearly manifest a contention that the possession by Claimants was invalid. It follows that the trial court did not misapply the doctrine of ouster. We overrule the second point of error.

In summary, Claimants recorded a warranty deed on June 2, 1978, manifesting themselves to be fee simple owners of the disputed strip. Suit contesting that claim of ownership was not brought until November 21, 1984, well over five years later. Under an agreement with the prior possessors, Claimants were already in possession of the strip at the time they received conveyance. After recording their deed, Claimants promptly paid all taxes on the strip as they fell due. Early in their dealings with the strip, Claimants made extensive and valuable improvements. They continuously exercised possession and control to an extensive degree.

Owners concede all of the foregoing. The base their case on the contention that the possession was not exclusive as against Owners—that Owners were never completely excluded from the use or possession of the strip. They present an alternative but unspecific claim of re-entry and ouster. And, they finally contend that the possession by Claimants was not hostile against Owners—that Claimants failed to exclude

the possibility that possession was permissive in nature.

However, Owners have only appealed on a legal insufficiency or "no evidence" basis. With the appeal in such posture, we must disregard all evidence in favor of Owners' position unless Owners' evidence is admitted or otherwise uncontroverted; we must resolve all conflicting inferences in favor of the judgment.

We hold that the uncontroverted evidence does not conclusively show that Claimants never gained exclusive possession of the premises for a five year period of time after June 2, 1978; neither does it show that such possession once established was ever *interrupted* by Owners; nor does it conclusively show that Claimants' possession was permissive rather than *hostile*. Owners have not invoked the right to the evidence reviewed and we do not do so. It follows that the judgment below must be,

AFFIRMED.

WHITHAM, J., concurs.

WHITHAM, Justice, concurring.

I concur in the result. I refer to the appellants as "West End" and the appellees as "Rothpletz." Before expressing my views on adverse-possession issues addressed by the majority, I must recognize an issue not acknowledged in the majority's opinion. That issue is West End's record ownership of the strip. West End's record ownership of the strip is based on application of the "strip and gore doctrine." The strip and gore doctrine provides that:

> Where it appears that a grantor has conveyed all land owned by him adjoining a narrow strip of land that has ceased to be of any benefit or importance to him, the presumption is that the grantor intended to include such strip in such conveyance; unless it clearly appears in the deed, by plain and specific language, that the grantor intended to reserve the strip.

*Cantley v. Gulf Production Co.*, 135 Tex. 339, 344, 143 S.W.2d 912, 915 (1940). By partial summary judgment, the trial court determined that West End had record title to the strip under the strip and gore doctrine. By cross-point, Rothpletz has preserved and assigned trial court error in granting this partial summary judgment in favor of West End. Since the majority's opinion stands silent on matters raised by Rothpletz's cross-point except in its footnote three, I state my view that the issues raised in Rothpletz's cross-point have not been addressed by this court and that those issues must be addressed by this court or the Supreme Court before a take-nothing judgment could be rendered against Rothpletz. I go to these lengths to point out Rothpletz's cross-point because I do not want my concurrence to be read as agreeing that this court has considered and overruled Rothpletz's cross-point. Thus, in my view, Rothpletz's cross-point remains to be disposed of in the event this court or the Supreme Court should hereafter decide to reverse the trial court's judgment. Consequently, for the purposes of this opinion, I assume, but do not decide, that West End was the record owner of the strip. Thus, I reach the question of whether Rothpletz acquired title to the strip by adverse possession.

In its prayer in its original brief in this court, West End asks that we reverse and render judgment declaring that full legal and equitable title to the strip is vested in West End. In its prayer in its brief for appellant and cross-appellees, West End asks that we reverse the trial court's judgment and stops at that point. Nowhere does West End in that brief pray that we render. Nowhere in that brief does West End pray that we remand. When an appellate court reverses and the appellant's brief contains no request for a remand, the appellate court assumes that the appellant considers the case fully developed and renders judgment. *See Texas Prudential Insurance Co. v. Dillard*, 158 Tex. 15, 32, 307 S.W.2d 242, 252 (1957). Therefore, I agree with the majority that, given West End's prayers in its briefs in this court, we must treat West End's three points of error as challenges to the legal sufficiency of the evidence (1) establishing Rothpletz's exclusive possession of the strip, (2) negating Rothpletz's ouster by West End from the

strip and (3) establishing Rothpletz's hostile possession of the strip. To my mind, the following exchange of letters between West End and Rothpletz constitutes the requisite evidence of probative value establishing Rothpletz's exclusive possession, negating ouster by West End and establishing Rothpletz's hostile possession. The parties exchanged these letters more than five years after Rothpletz asserted title to the strip. While the majority refers to these letters as a "letter agreement" in disposing of West End's third point of error concerning hostile possession, I am of the opinion that the letters on their face pertain to each of West End's three points and constitute more than a scintilla of evidence in support of all of the trial court's findings on adverse possession. As used in the letters, know that the adjoining parking lot to 1800 N. Market Street consists of land owned of record by Rothpletz and the disputed strip. Thus, reference in the letters to a parking lot adjoining 1800 N. Market Street includes the disputed strip. Know also that the 1911 N. Market Street parking lot is West End's property.

The first letter, dated June 13, 1984, from Rothpletz to West End reads as follows:

Re: Temporary use of
parking lot at 1800
N. Market Street

Dear Mr. Lavie:

The owners of the property at 1800 N. Market Street and the adjoining parking lot have authorized me to agree to your temporary use of all or a portion of the parking lot which adjoins 1800 N. Market Street beginning June 20th and continuing thru the months of July and August.

In consideration for using our parking lot during the above mentioned period, it is my understanding that the tenants, clients and guests of the occupants of 1800 N. Market Street may use your lot at 1911 N. Market Street (which is directly behind 1800 N. Market).

It is my further understanding that a large trash collector and other construction materials will be placed on our lot and if any damage occurs to our lot, your company will repair same to its condition prior to your use of the property. You have also agreed to keep trash and debris cleaned up and policed.

Our understandings as set forth in this letter are terminable by either party upon one week's notice. Other than the mutual consideration above extended, no additional consideration is expected by either of us as the result of these matters.

You may indicate your agreement by executing and returning to me a copy of this letter.

Best wishes for a successful project.

1800 N. Market Street
Owners
/s/ John K. Rothpletz
By: John K. Rothpletz,
Trustee

Agreed: West End API, Ltd.
/s/ Lavie
By: Robert Lavie,
Managing Partner

The second letter, dated June 14, 1984, from West End to Rothpletz reads:

Dear Mr. Rothpletz:

Please find enclosed a duly executed copy of your letter dated June 13, 1984.

It was a pleasure meeting with you yesterday and, I look forward to discussing further with you the future use of both our parking lots.

Very truly yours,
/s/ Lavie
Robert Lavie
Managing Partner
for West End API, Ltd.

West End filed this action on November 21, 1984. Thus, in these letters dated approximately five months before filing this action, West End admitted that Rothpletz owned the strip: (1) by trading Rothpletz the use of West End's parking lot for the use of Rothpletz's parking lot (which includes the strip) while construction work was performed on West End's building; (2) by agreeing to repair any damage to Rothpletz's parking lot; and, (3) by agreeing to keep Rothpletz's parking lot cleaned and policed. Indeed, West End's letter concludes with a reference to "both our park-

ing lots." The trial court made written findings of fact and conclusions of law. In findings of fact numbers thirteen and fifteen, the trial court found that:

13. For more than ten years prior to November 21, 1984, Rothpletz and his predecessors in interest, among whom there was privity of estate, under claim of right, used the strip and held possession if [sic] it that was peaceable, continuous, uninterrupted, exclusive, adverse, open, actual, visible and notorious, inconsistent with and hostile to any claim by any other person.

\* \* \* \* \* \*

15. Rothpletz and his predecessors in interest established possession of the strip as found above, and thereafter neither West End nor its predecessors in interest ever ousted Rothpletz or his predecessors in interest from their exclusive, adverse possion [sic] of the strip.

The trial court went on to conclude that "Rothpletz has full title to the strip, precluding all claims."

Since the present case was tried before the court without a jury, the court sits as a trier of the facts as well as the law. He is the judge of the credibility of witnesses and the weight to be given their testimony, and his findings are entitled to the same weight and conclusiveness on appeal as a jury verdict. Where there is some evidence of a substantial and probative character to support the trial court's findings and judgment, they are controlling upon a reviewing court and will not be disturbed. *Hood v. Texas Indemnity Insurance Co.*, 146 Tex. 522, 523–26, 209 S.W.2d 345, 346–47 (1948); *Richardson v. Raby*, 376 S.W.2d 422, 426 (Tex.Civ.App.—Tyler 1964, no writ). As explained, because of West End's prayer for relief in this court, we must treat each of West End's points of error as an attack on the legal sufficiency of the evidence. A "legally insufficient" point is a "no evidence" point presenting a question of law. In deciding that question, the appellate court must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

Applying these principles to the present case, and considering only the evidence and inferences tending to support the trial court's findings of fact in support of its judgment and disregarding all evidence and inferences to the contrary, I conclude that the statements and admissions contained in the two letters are some evidence of probative value that Rothpletz had exclusive possession of the strip, that West End did not oust Rothpletz from the strip and that Rothpletz had hostile possession of the strip. In short, it was within the trial court's prerogatives to treat West End's actions in signing the two letters as West End's admission that Rothpletz had acquired title to the strip by adverse possession. Consequently, I agree that we must affirm the trial court's judgment.