COURT OF 
APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-160-CV
  
  
E.G. 
“GENE” TURNER AND                                                     APPELLANT
JAMES 
BURDEN
  
V.
  
SIDNEY 
R. MULLINS AND                                                        APPELLEES
AMARYLLIS 
G. MULLINS
   
------------
 
FROM 
THE 30TH DISTRICT COURT OF WICHITA COUNTY
 
------------
 
OPINION
 
------------
Island 
in the stream?
Is 
that where it belongs?
Is 
there water in between?
To 
whom does it belong?[1]

I. Introduction
        E.G. 
“Gene” Turner and James Burden (“Turner and Burden”) appeal from the 
trial court’s judgment establishing ownership of a tract of land (the 
“Disputed Land”) in Sidney R. and Amaryllis G. Mullins (the “Mullinses”). 
In three issues, Turner and Burden complain that the trial court erred in 
finding and rendering judgment (1) that there exists no southern fork of the Red 
River in the vicinity of the Disputed Land, that the Disputed Land is not 
located in Cotton County, Oklahoma, and that the Disputed Land has accreted to 
the Mullinses’ land in Wichita County, Texas; (2) that Turner and Burden did 
not acquire title to the Disputed Land by conveyance and Oklahoma’s 
Simplification of Land Titles Statute; and (3) that Turner and Burden did not 
acquire title to the Disputed Land by adverse possession.[2] 
 Because we hold that the Mullinses did not acquire all the Disputed Land 
by accretion and that the trial court must consider Oklahoma law in determining 
ownership of at least a portion of the Disputed Land, we will reverse and 
remand.
II. Factual and Procedural Background
        This 
is an accretion case involving title to a tract of land located in or along the 
Red River between Burkburnett, Texas and Devol, Oklahoma. The Mullinses own a 
tract of land in Texas immediately south of the Disputed Land and claim title to 
the Disputed Land under the doctrine of accretion,[3] 
that is, they claim that the Disputed Land is now attached to the Texas mainland 
property they own and is therefore their property. Turner and Burden argue that 
the Disputed Land is an island in the bed of the Red River and claim ownership 
by virtue of deeds filed in Cotton County, Oklahoma and an Oklahoma statute 
governing the simplification of land titles. Alternatively, Turner and Burden 
claim title to the Disputed Land by adverse possession.
        The 
Mullinses filed suit against Turner and Burden on September 25, 2000. The case 
was tried to the bench on October 14 and 15, 2003. On March 31, 2004 the trial 
court entered a Final Judgment declaring that (1) the Mullinses are the fee 
simple owners of the Disputed Land, and (2) Turner and Burden have no right, 
title, or interest in the Disputed Land. The trial court later issued Findings 
of Fact and Conclusions of Law in support of its judgment.[4]
III. Accretion of the Disputed Land
        In 
their first issue, Turner and Burden contend that the trial court erred when it 
found (1) that there exists no southern fork of the Red River separating the 
Disputed Land from the Mullinses’ property, (2) that the Disputed Land is not 
located in Oklahoma, and (3) that the Disputed Land accreted to the Mullinses’ 
land.[5]  Turner and Burden argue that a southern 
fork of the Red River separates the Disputed Land from the mainland, so the 
Disputed Land is an island in the bed of the Red River. Further, Turner and 
Burden assert that the boundary between Texas and Oklahoma lies along the south 
bank of this southern fork.  Accordingly, Turner and Burden argue that 
because the Disputed Land is an island located north of this southern bank, the 
Disputed Land is in Oklahoma.
        The 
Mullinses respond that there is sufficient evidence in the record to support the 
trial court’s findings. Specifically, the Mullinses contend that the boundary 
between Texas and Oklahoma, for purposes of title to the land, is the gradient 
boundary[6] located along the south bank of the Red 
River, which here forms the northern boundary of the Disputed Land.  
Although the Mullinses acknowledge that a small portion of the Disputed Land was 
once an island in the bed of the Red River, they contend that the Red River has 
over time “deposited solid material, mud, sand, and sediment along [its] 
southern bank” so that the Disputed Land is no longer an island but is 
attached to the Texas mainland.  Therefore, the Mullinses assert that 
because the gradient boundary of the river now lies north of the Disputed Land, 
the Disputed Land is located in Texas.  Accordingly, the Mullinses argue 
that they have acquired the Disputed Land by accretion.
A. Standard of Review
        Findings 
of fact entered in a case tried to the court have the same force and dignity as 
a jury's answers to jury questions.  Anderson v. City of Seven Points, 
806 S.W.2d 791, 794 (Tex. 1991).  The trial court's findings of fact are 
reviewable for legal and factual sufficiency of the evidence to support them by 
the same standards that are applied in reviewing evidence supporting a jury's 
answer.  Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina 
v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).
        Because 
the Mullinses bore the burden of proof at trial, we will address Turner and 
Burden’s legal sufficiency complaint as a “no evidence” issue and their 
factual sufficiency complaint as an “insufficient evidence” issue.  See 
Gooch v. Am. Sling Co., 902 S.W.2d 181, 183-84 (Tex. App.—Fort Worth 1995, 
no writ) (applying “no evidence” standard when the party without the burden 
of proof challenges the legal sufficiency of the evidence and “insufficient 
evidence” standard when the party without the burden of proof challenges the 
factual sufficiency).
        In 
determining a “no-evidence” issue, we are to consider only the evidence and 
inferences that tend to support the finding and disregard all evidence and 
inferences to the contrary. Bradford v. Vento, 48 S.W.3d 749, 754 (Tex. 
2001); Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 
1996); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 
(1951).  Anything more than a scintilla of evidence is legally sufficient 
to support the finding. Cazarez, 937 S.W.2d at 450; Leitch v. Hornsby, 
935 S.W.2d 114, 118 (Tex. 1996).  More than a scintilla of evidence exists 
if the evidence furnishes some reasonable basis for differing conclusions by 
reasonable minds about the existence of a vital fact. Rocor Int’l, Inc. v. 
Nat’l Union Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).
        An 
assertion that the evidence is “insufficient” to support a fact finding 
means that the evidence supporting the finding is so weak or the evidence to the 
contrary is so overwhelming that the answer should be set aside and a new trial 
ordered.  Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).  We 
are required to consider all of the evidence in the case in making this 
determination.  Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 
(Tex.), cert. denied, 525 U.S. 1017 (1998).
B. Analysis
The 
Doctrine of Accretion
        Accretion 
is the process of increasing real estate by the gradual and imperceptible 
disposition by water of solid material through the operation of natural causes 
so as to cause that to become dry land that was once before covered by 
water.  Brainard, 12 S.W.3d at 17. On the other hand, erosion is the 
process of wearing away the land.  Id.  Generally, as with 
accretion, erosion occurs gradually and imperceptibly.  Id.  A 
riparian owner ordinarily gains title to land by accretion and loses title to 
land by erosion.  Id.
        Texas 
follows the general rule that when the location of the margin or bed of a body 
of water that constitutes the boundary of a tract of land is gradually and 
imperceptibly changed by accretion or erosion, the margin or bed of the body of 
water, as so changed, remains the boundary line of the tract, which is extended 
or restricted accordingly.  Id.; see Hancock v. Moore, 135 
Tex. 619, 146 S.W.2d 369, 370 (1941); Manry v. Robison, 122 Tex. 213, 56 
S.W.2d 438, 443-44 (1932); Tyler v. Gonzales, 189 S.W.2d 519, 521-22 
(Tex. Civ. App.—San Antonio 1945, writ ref'd w.o.m.); Denny v. 
Cotton, 3 Tex. Civ. App. 634, 22 S.W. 122, 124 (1893, writ ref'd).[7]  Thus, a riparian owner acquires title to all 
additions or extensions to the land through accretion and loses title to 
portions of the land that are worn, washed away, or encroached upon by the 
water.  See Brainard, 12 S.W.3d at 18.  The rights of the 
riparian owner to additions to land by accretion are vested property 
rights.   Id.
        Title 
to an island arising in a river generally follows title to the bed of river in 
which it was formed. See Maufrais v. State, 142 Tex. 559, 
180 S.W.2d 144, 150 (1944); City of Victoria v. Schott, 9 Tex. Civ. App. 
332, 29 S.W. 681, 682 (1895, no writ).  In navigable streams, the soil, and 
hence all islands formed upon it, belong to the sovereign.  Schott, 
29 S.W. at 682.  In streams not navigable, the riparian proprietors own to 
the middle thread of the stream, unless, by necessary construction of their 
grants, their boundaries are restricted.  Id.  Upon formation, 
title to the island vests in the owner of the riverbed.  Schott, 29 
S.W. at 682; see Maufrais, 180 S.W.2d at 150.
        Where 
ownership of the island and the mainland differ, and the island is later joined 
with the mainland through accretion, the owner of the mainland is not entitled 
to the island as an accretion because the island already existed as the property 
of another; it was not an imperceptible and gradual accretion to the 
mainland.  See Schott, 29 S.W. at 682.  It logically follows 
that where an island is later joined with the mainland through accretion, the 
owner of the island is entitled to accretions to the island, just as the owner 
of the mainland is entitled to accretions to the mainland.  See id.; 
C.C. Marvel, Annotation, Applicability of Rules of Accretion and Reliction so 
as to Confer Upon Owner of Island or Bar in Navigable Stream Title to Additions, 
54 A.L.R.2d 643 (2004) (stating in section 2, “It may be stated as a very 
general principle, when followed to its ultimate, logical conclusion, that the 
owner of an island is entitled to additions thereto, under the proper 
application of general principles of accretion and reliction, in the same manner 
as is the owner of riparian land on the mainland.”).
        In 
Oklahoma v. Texas, the U.S. Supreme Court held the boundary between the 
states of Oklahoma and Texas in this area to be along the southern bank of the 
Red River.  260 U.S. 606, 636, 43 S. Ct. 221, 226.  To establish the 
boundary, the Court commissioned surveyors to run, locate, and mark the boundary 
upon the ground.  Id.  at 640, 43 S. Ct. at 228; See 
Oklahoma v. Texas, 261 U.S. 340, 341-44, 43 S. Ct. 376, 376-77.  The 
Court later adopted the surveyors’ findings establishing the gradient boundary 
as the border between the two states, subject to the changes brought by the 
gradual and natural processes known as erosion and accretion.  Oklahoma 
v. Texas, 265 U.S. 500, 504-505, 44 S.Ct 573, 604.
        In 
support of their assertion that they acquired the Disputed Land by accretion, 
the Mullinses introduced into evidence a survey prepared by Arthur Eugene Probst 
Jr., an engineer and registered public surveyor.  Probst’s survey, dated 
August 14, 2000, reflects, among other things, the location of the Disputed Land 
in relation to the Red River, the 1923 gradient boundary, and the gradient 
boundary as of the date of the survey.  Probst testified that he conducted 
the survey at the request of Mr. Mullins. Probst’s survey shows that the 
gradient boundary had moved from its 1923 location south of the Disputed Land to 
the northern boundary of the Disputed Land.  Probst stated that the 1923 
map (the Mullinses’ exhibit forty-three) shows an island in the bed of the Red 
River approximately where the MKT railway is located.  He testified that he 
believed that this former island comprised only a small part of the Disputed 
Land and that it had been connected to the south bank of the Red River by the 
accumulation of salt cedar, which catches a lot of material coming down the 
river.  Turner and Burden, on the other hand, presented no survey of the 
Disputed Land, nor did they present any expert testimony to refute Probst’s 
finding that the gradient boundary had moved north of the Disputed Land.
        The 
Mullinses also introduced into evidence several aerial photographs of the 
Disputed Land and surrounding area taken in the spring of 2003.  The 
Mullinses argue that these photographs show the Red River to be a wide body of 
water located north of the Disputed Land.
        Finally, 
Mr. Mullins testified that he owns 211 acres directly south of the Disputed Land 
and that his property extends to the southern bank of the Red River.  He 
testified that he has lived along the Red River all his life, that he has 
observed the river change over the years, and that he believes the Red River has 
moved north of the Disputed Land.  Mr. Mullins also testified that he had 
no recollection of the Disputed Land ever being an island in the bed of the Red 
River, but he admitted that to get to the Disputed Land from his property one 
must cross a small stream that sometimes holds water.  He testified that 
some people call the stream Wild Horse Creek.
        Turner 
and Burden generally assert that the Disputed Land has long been known to be an 
island in the bed of the Red River.  In support of their position, they 
point out that their deeds describe the Disputed Land as being an island in the 
bed of the Red River bisected by the MKT Railway Bridge.  In addition, 
Turner and Burden introduced several photographs taken on April 26, 2002 
depicting a flow of water coming down what they argue is the southern fork of 
the Red River just north of the 1923 boundary.  Turner and Burden also 
point out that the photographs introduced into evidence by Mullins show a flow 
of water south of the Disputed Land.  Finally, Turner and Burden introduced 
into evidence an aerial photograph exhibit, upon which Burden marked in red the 
location of the 1923 gradient boundary.[8]  
Turner and Burden assert that it is no coincidence that the 1923 boundary 
depicted on this exhibit so closely follows what they allege is a southern fork 
of the Red River.
        In 
rebuttal, the Mullinses introduced evidence that the average rainfall for the 
area in the month that Turner and Burden’s photographs were taken is 2.62 
inches and that in the 24 hours preceding the date of Turner and Burden’s 
photographs more than 2 inches of rain had fallen.  Accordingly, they 
assert that Turner and Burden’s photographs actually show runoff from a normal 
month’s worth of rain in only 24 hours.  Further, the Mullinses 
introduced photographs showing that the stream was dry on the date of trial.
        After 
reviewing the evidence, we conclude that the evidence is both legally and 
factually sufficient to support the trial court’s findings that there exists 
no southern fork of the Red River in the vicinity of the Disputed Land and that 
no part of the Disputed Land lies in Oklahoma.  The Mullinses presented 
some evidence that the southern bank of the Red River, which constitutes the 
boundary between Texas and Oklahoma, lies north of the Disputed Land.  
Thus, we conclude there to be more than a scintilla of evidence supporting the 
trial court’s findings.  See Cezarez, 937 S.W.2d at 450; Leitch, 
935 S.W.2d at 118.  Further, although some evidence also suggests that 
there may exist a southern fork of the Red River separating the Disputed Land 
from the Mullinses property, we conclude that the evidence supporting the trial 
court’s findings is not so weak or the evidence to the contrary so 
overwhelming that the trial court’s findings should be set aside and a new 
trial ordered.  See Garza, 395 S.W.2d 823.
        On 
the other hand, we conclude that the evidence is legally insufficient to support 
the trial court’s finding that all of the Disputed Land accreted to the 
Mullinses’ land.  The record reflects that a portion of the Disputed Land 
was once an island in the bed of the Red River.  Therefore, title to the 
island vested upon its formation, and the owner of the island is entitled to 
accretions to the island, just as the Mullinses’, as owners of the mainland, 
are entitled to accretions to the mainland.  Here, the Mullinses presented 
no evidence at trial to prove that they ever owned the former island before it 
joined the mainland.  Accordingly, while the Mullinses are entitled to 
ownership of the portion of the Disputed Land that constitutes accretions to the 
mainland, they are not entitled to the portion of the Disputed Land that 
constitutes the former island or accretions to the former island because they 
have not proven title to the island and because they cannot acquire title to the 
former island by accretion.
        Therefore, 
we sustain Turner and Burden’s first issue to the extent it challenges the 
trial court’s judgment that the Mullinses are the fee simple owners of all of 
the Disputed Land by virtue of accretion.  We overrule the remainder of 
their first issue.
IV. Title by Conveyance
        Turner 
and Burden also contend that the trial court erred in finding and rendering 
judgment that they did not acquire title to the Disputed Land by Oklahoma 
conveyances and by virtue of an Oklahoma statute governing the simplification of 
land titles.[9]
A. Standards of Review
        We 
review a trial court's actual or implied conclusions of law de novo as legal 
questions.  See, e.g., Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 
928 (Tex. 1998), cert. denied, 526 U.S. 1144 (1999) (applying de novo 
standard to question of subject matter jurisdiction); Michel v. Rocket 
Eng’g Corp., 45 S.W.3d 658, 667 (Tex. App.—Fort Worth 2001, no pet.) 
(holding "[w]e review all questions of law de novo.")  A trial 
court's conclusion of law will not be reversed unless it is erroneous as a 
matter of law.  Arch Petroleum, Inc. v. Sharp, 958 S.W.2d 475, 477 
(Tex. App.—Austin 1997, no pet.).  Conclusions of law are not erroneous 
and will be upheld on appeal if the judgment can be sustained on any legal 
theory supported by the evidence.  Copeland v. Alsobrook, 3 S.W.3d 
598, 604 (Tex. App.—San Antonio 1999, pet. denied).
        As 
to findings of fact, because Turner and Burden bore the burden to prove that 
they acquired title by conveyance, we will address Turner and Burden’s legal 
sufficiency complaint as a “matter of law” issue and their factual 
sufficiency complaint as an “against the great weight and preponderance” 
issue.  See Gooch, 902 S.W.2d at 183-84.
1. 
“Matter of Law”
        If 
an appellant is attacking the legal sufficiency of an adverse answer to an issue 
on which he had the burden of proof, the appellant must overcome two 
hurdles.  Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 
940 (Tex. 1991).  First, the record must be examined for evidence that 
supports the finding, while ignoring all evidence to the contrary.  Second, 
if there is no evidence to support the finding, then the entire record must be 
examined to see if the contrary proposition is established as a matter of 
law.  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001); Sterner 
v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).  The issue should 
be sustained only if the contrary proposition is conclusively established. Dow 
Chem. Co., 46 S.W.3d at 241-42.
2. 
“Against Great Weight and Preponderance”
        Similarly, 
if a party with the burden of proof makes a factual sufficiency challenge, he 
must show that the finding was against the “great weight and preponderance” 
of the evidence.  Pac. Employers Ins. Co. v. Dayton, 958 S.W.2d 452, 
455 (Tex. App.—Fort Worth 1997, pet. denied).  In reviewing an issue 
asserting that a finding is “against the great weight and preponderance” of 
the evidence, we must consider and weigh all the evidence and set aside the 
finding only if the evidence is so weak or the finding is so contrary to the 
great weight and preponderance of the evidence as to be clearly wrong and 
unjust.  Dow Chem. Co., 46 S.W.3d at 241; In re King's Estate, 
150 Tex. 662, 244 S.W.2d 660, 661 (1951).
B. Analysis
        At 
trial, Turner and Burden introduced into evidence deeds dated January 13, 14, 
and 16, 1969 to Turner conveying the following described property:
   
An island in the bed of Red River bisected by the MKT Railway Bridge between 
Burkburnett, Texas, and Devol, Oklahoma, and as a matter of record in the 
Agricultural Adjustment Administration of Cotton County, Oklahoma, this island 
is described as the Southwest One-Fourth (SW/4) of Section Five (5), Township 
Five (5) South, Range Thirteen (13) West, I.M. as well as all land adjoining and 
contiguous to the above described property which is under fence and claimed by 
[the grantor].
  
Turner 
and Burden assert that these deeds, along with Turner’s subsequent deed to 
Burden, establish that Burden currently holds title to the Disputed Land under 
Oklahoma law.  Further, Turner and Burden argue that the Red River Boundary 
Compact establishes these deeds as evidence of record title.[10]
        We 
note that Turner and Burden’s expert, Robert Rafuse, testified that he 
believed that Burden had acquired title to the Disputed Land by either “color 
of title since 1969 . . . or by adverse possession” under Oklahoma law.  
Further, we note that Rafuse testified that under Oklahoma’s Simplification of 
Land Titles Act,[11] the Mullinses were required to 
file notice of any claim they had to the Disputed Land within one year of the 
effective date of the Act, and it was his understanding that they failed to do 
so.  On cross-examination, however, Rafuse acknowledged that his opinions 
were based on Oklahoma law and would apply only if the Disputed Land were in 
Oklahoma.  Accordingly, the Mullinses argue that Turner and Burden’s 
claims to the Disputed Land under Oklahoma law are irrelevant because the 
Disputed Land lies in Texas, not Oklahoma.[12]  
In addition, we note that if any part of the Disputed Land represents accretions 
to the mainland, there is no evidence in the record of any conveyances 
purporting to give Turner or Burden interest in those accretions.
        As 
previously discussed, the boundary between Texas and Oklahoma in this area lies 
along the southern bank of the Red River.  The record reflects that as of 
1923, the Texas-Oklahoma border was south of the island, and the island was 
located in Oklahoma.  However, the record also reflects that as of August 
14, 2000, the island was connected to the Texas mainland, the Texas-Oklahoma 
border was north of the former island, and the former island was located in 
Texas.
        In 
determining the ownership of property, we apply the law of the jurisdiction in 
which the land is located.  See Colden v. Alexander, 141 Tex. 134, 
171 S.W.2d 328, 335-36 (1943) (indicating that title to realty can be affected 
only by the law of the jurisdiction in which it is situated); Toledo Soc. for 
Crippled Children v. Hickok, 152 Tex. 578, 261 S.W.2d 692, 696 (1953) 
(indicating that the validity of an instrument conveying realty is determined by 
the laws of the jurisdiction in which it is located).  Thus, in deciding 
who owns the Disputed Land today, we must apply Texas law.
        Texas 
law provides that “[t]itles to land in ceded or even conquered territory 
acquired from a former sovereignty when it had the right to grant them are of 
course valid, even as against the succeeding sovereignty.”  See Kenedy 
Pasture Co. v. State, 111 Tex. 200, 231 S.W. 683, 691 (1921); see also 
Jones v. P.A.W.N. Enters., 988 S.W.2d 812, 821 (Tex. App.—Amarillo 1999, 
pet. denied).  Thus, because at least a portion of the Disputed Land was 
once located validly in Oklahoma, Texas law requires that we look to Oklahoma 
law in determining whether Turner or Burden acquired title to any portion of the 
Disputed Land while it was located in Oklahoma.
        Our 
review of the record indicates that the trial court did not consider Oklahoma 
law in evaluating Turner and Burden’s claims of ownership by conveyance.  
Thus, because we have already determined, in evaluating Turner and Burden’s 
first issue, that the trial court erred when it found that the Mullinses 
acquired title to all the Disputed Land by accretion, and because we now 
determine that the trial court erred by not evaluating the validity of Turner 
and Burden’s claims of ownership by conveyance under Oklahoma law, we hold 
that the trial court’s fact finding that Turner and Burden did not acquire 
title to any portion of the Disputed Land by virtue of conveyance to be against 
the great weight and preponderance of the evidence.  Further, for these 
same reasons we also hold that the trial court erred as a matter of law in 
concluding the Mullinses to be the fee simple owners of all the Disputed Land 
and that Turner and Burden have no right, title, or interest in any portion of 
the Disputed Land.  Accordingly, we sustain Turner and Burden’s third 
issue challenging the trial court’s judgment that Turner and Burden have no 
right, title, or interest in the Disputed Land.
Title by 
Adverse Possession
        Finally, 
Turner and Burden in their second issue contend that the trial court erred when 
it found that they had not acquired title to the Disputed Land by adverse 
possession.[13]  Specifically, Turner and Burden 
assert that they have pleaded and proven the affirmative defense of adverse 
possession under the three year, ten year, and twenty-five year provisions of 
the Texas Civil Practice and Remedies Code and under Oklahoma’s adverse 
possession statute.  In support of their contention, Turner and Burden 
presented expert testimony indicating that they had established title by adverse 
possession under both Texas and Oklahoma law.
A. Standard of Review 
        Turner 
and Burden, as the parties seeking to establish title to land by adverse 
possession, had the burden to prove every fact essential to that claim by a 
preponderance of the evidence.  Rhodes v. Cahill, 802 S.W.2d 643, 
645 (Tex. 1990) (op. on reh'g).  Accordingly, we will address Turner and 
Burden's legal sufficiency complaint as a “matter of law” issue and their 
factual sufficiency complaint as an “against the great weight and 
preponderance” issue.  See Gooch, 902 S.W.2d at 181, 183-84.  
Conclusions of law may not be challenged for factual sufficiency, but they may 
be reviewed to determine their correctness based upon the facts.  Rogers 
v. City of Fort Worth, 89 S.W.3d 265, 277 (Tex. App.—Fort Worth 2002, no 
pet.).
        Because 
the question of adverse possession normally is a question of fact, only in rare 
instances is a reviewing court justified in holding that adverse possession has 
been established as a matter of law.  See Bywaters v. Gannon, 686 
S.W.2d 593, 595 (Tex. 1985).  In order to establish adverse possession as a 
matter of law, the claimant must show by undisputed evidence that he adversely 
possessed the property continuously for the statutory period.  See id.  
The claimant must submit undisputed and conclusive evidence of probative force 
on each essential element of adverse possession, and inferences are never 
indulged in his favor.  See id.; Dunn v. Taylor, 102 Tex. 80, 
113 S.W. 265, 267 (1908).
B. Analysis
        The 
three year, ten year, and twenty-five year Texas statutes under which Turner and 
Burden assert title by adverse possession all require that Turner and Burden 
prove, at a minimum, that they adversely possessed the Disputed Land for the 
relevant time period provided for in the statute.  See Tex. Civ. Prac. & Rem. Code Ann. 
§§ 16.024, 16.026, 16.027, 16.028 (Vernon 2002).
        Adverse 
possession is defined in section 16.021 of the civil practice and remedies code 
as “an actual and visible appropriation of real property, commenced and 
continued under a claim of right that is inconsistent with and is hostile to the 
claim of another person.”  Id. § 16.021(1); Rhodes, 802 
S.W.2d at 645.  The possession must be actual, visible, continuous, 
notorious, distinct, hostile, and of such character as to indicate unmistakably 
an assertion of a claim of exclusive ownership in the occupant.  Rhodes, 
802 S.W.2d at 645.  Exclusive possession of the land is required to support 
an adverse possession claim; the adverse possession claimant must wholly exclude 
the owner of the property.  Terrill v. Tuckness, 985 S.W.2d 
97, 107 (Tex. App.—San Antonio 1998, no pet.); Kleckner v. McClure, 524 
S.W.2d 608, 613 (Tex. Civ. App.—Fort Worth 1975, no writ).  Joint or 
common possession by the adverse possession claimant and the owner defeats the 
requisite quality of exclusiveness.  West End API Ltd. v. Rothpletz, 
732 S.W.2d 371, 375-76 (Tex. App.—Dallas 1987, writ ref. n.r.e.) (citing Rick 
v. Grubbs, 147 Tex. 267, 214 S.W.2d 925, 927 (1948)).
        Here, 
the record reflects that both parties were using the Disputed Land.  
Although Turner and Burden produced evidence that they used the Disputed Land, 
so too did the Mullinses.  Mr. Mullins testified that he was born on 
December 20, 1958 and that as far back as he could remember he and other family 
members had hunted, fished, and camped on the Disputed Land.  He also 
testified that he and other members of his family visited the Disputed Land to 
go swimming.  He testified that over the years he had gone on the Disputed 
Land approximately twenty times per year and that during that time he 
encountered Turner three or four times.  He testified that Turner had never 
asked him to leave the Disputed Land and that he was unaware of Turner ever 
asking any member of the Mullins family to do so.
        Several 
other members of the Mullins family also testified that they used the Disputed 
Land.  Mrs. Mullins testified that she and Mr. Mullins’s cousins would go 
swimming on the property on Sunday afternoons and that Mr. Mullins’s cousins 
would hunt on the property.  In addition, she testified that she and Mr. 
Mullins’s cousins would see Turner while on the Disputed Land and that he 
never asked them to leave.  Further, Tim Mullins, Mr. Mullins’s cousin, 
testified that he first entered the Disputed Land around 1964 and that he has 
hunted, trapped, swum, and ridden motorcycles on the Disputed Land in the years 
since.  He testified also that he had seen Turner while on the Disputed 
Land and that Turner had never asked him to leave.  Finally, Monte Mullins, 
Mr. Mullins’s brother, testified that he would walk, hunt, and swim on the 
Disputed Land and that Turner had never asked him to leave.
        Turner 
and Burden contend that these entries came at a time when the Mullinses did not 
claim any interest in the Disputed Land.  The Mullinses respond that Turner 
and Burden are attempting to shift the burden of proof regarding the elements of 
adverse possession.  See Tex. 
Civ. Prac. & Rem. Code Ann. § 16.021.  We agree.  As 
previously stated, Turner and Burden bore the burden to prove every fact 
essential to their claim by a preponderance of the evidence.  See Rhodes, 
802 S.W.2d at 645.  Accordingly, Turner and Burden had the burden to prove 
that the Mullinses entries came at a time when the Mulinses did not claim any 
interest in the Disputed Land.  See id.  This is something they 
did not do.
        Turner 
and Burden also contend that these entries occurred with permission.  In 
support of this contention, Turner and Burden assert that the Mullinses spoke 
with and obtained a key from Turner.  However, we note that the key was to 
a gate located on Turner’s adjacent property and not the Disputed Land.  
Further, witness Tim Mullins testified that he asked Turner for a key to the 
gate on Turner’s land so that he could have better access to the Disputed 
Land, not because he believed that it was necessary to get Turner’s permission 
to go on the Disputed Land.
        Thus, 
after reviewing the record, we conclude that Turner and Burden did not prove as 
a matter of law that their possession of the Disputed Land was adverse or 
hostile to the claim of the Mullinses or that Turner and Burden wholly excluded 
the Mullinses from the Disputed Land for any of the requisite limitations 
periods.  Further, we conclude that while Turner and Burden presented 
expert testimony indicating that they had obtained title by adverse possession, 
the adverse findings of the trial court as to Turner and Burden’s adverse 
possession of the Disputed Land were not against the great weight and 
preponderance of the evidence.  We also conclude, for these same reasons, 
that Turner and Burden failed to establish that they obtained title to the 
Disputed Land by adverse possession under Oklahoma law.  See Francis v. 
Rogers, 40 P.3d 481, 486 (Okla. 2001) (stating that an adverse possession 
claimant must show that the possession was hostile, under a claim of right or 
color of title, actual, open, notorious, exclusive, and continuous for the full 
statutory period); Rodgers v. Int’l Land Co., 238 P. 407, 408 (Okla. 
1924) (stating adverse possession must be shown by clear and positive proof).
        Accordingly, 
we hold that the trial court did not err in finding that Turner and Burden had 
not acquired title to the Disputed Land by adverse possession under Texas or 
Oklahoma law.  Turner and Burden’s second point is overruled.
V. Conclusion
        In 
sum, we hold that the Mullinses did not acquire title to all the Disputed Land 
by accretion, that the trial court must consider Oklahoma law in determining 
ownership of at least a portion of the Disputed Land, and that Turner and Burden 
did not acquire title to the Disputed Land by adverse possession.  
Accordingly, we reverse the judgment of the trial court and remand the case to 
the trial court for (1) a determination, in accordance with this opinion, of 
whether under Oklahoma law either Turner and Burden or the Mullinses have any 
right, title, or interest in the former island, and (2) if it be determined that 
ownership of the former island does not lie with the Mullinses, then for a 
determination by the trial court of what portion of the Disputed Land, if any, 
represents accretions to the Mullinses’ property and what portion, if any, 
represents accretions to the former island.
   
                                                          BOB 
MCCOY
                                                          JUSTICE
 
  
PANEL 
F:   HOLMAN, GARDNER, and MCCOY, JJ.
 
DELIVERED: 
March 31, 2005

 
Appendix
 
        The 
trial court’s Findings of Fact and Conclusions of Law challenged on appeal are 
as follows:

Findings of Fact
 
2.  
As referred to herein, the “Disputed Land” consists of all land located in 
the J.H. Hadden Survey A-90, Wichita County, Texas, north of the “1923 bank 
established by Supreme Court” as depicted in Exhibit #1 to the gradient 
boundary of the south bank of the Red River.  The Disputed Land is further 
depicted in Exhibit #3 as the area which is shaded by vertical lines.

4.  
Plaintiffs or their predecessors in title have owned all of the J.H. Hadden 
Survey A-90, Wichita County, Texas, save and except certain parcels.

7.  
There are no “multiple channels,” nor is there a “southern fork” of the 
Red River in the vicinity of the Disputed Land.

10.  
The Disputed Land is not Goat Island, nor is the Disputed Land an island in the 
bed of the Red River that is bisected by the MKT Railway Bridge.

11.  
The Disputed Land was once an island in the Red River, that was bisected by the 
MKT Railway Bridge, and which has since accreted to the J.H. Hadden Survey A-90 
of Wichita County, Texas.

12.  
The Disputed Land is now bounded on the north by the gradient boundary of the 
south bank of the Red River and on the south by the “1923 bank established by 
Supreme Court” as depicted in Exhibits #1 and #3 and further described as the 
shaded area of Exhibit #3.

13.  
As of August 14th, 2000, the location of the gradient boundary of the south bank 
of the Red River to the Disputed Land was that boundary depicted on Exhibits #1 
& #3 of the “South Bank Using Gradient Boundary.”

14.  
The Disputed Land has accreted to the Plaintiff’s land.

15.  
The Disputed Land is located in Wichita County, Texas.

16.  
No part of the Disputed Land is located in the State of Oklahoma.

17.  
Defendants did not acquire title to the Disputed Land by legal conveyance.

18.  
Defendants did not acquire title to the Disputed Land by adverse possession or 
by limitations.

19.  
Plaintiffs’ suit is not barred by limitations.

20.  
Defendants have not continuously held the Disputed Land in peaceable and adverse 
possession for three, ten or twenty five years.

21.  
Defendants have never held the Disputed Land in good faith under duly recorded 
deeds.

22.  
Defendants’ have not continuously used, possessed, enjoyed or cultivated the 
Disputed Land for three, ten, or twenty five years.  Rather, Defendants’ 
use of the land was only occasional and intermittent.

23.  
Defendants’ occasional use of the land was neither open, nor notorious.

24.  
Defendants’ occasional use of the land was neither adverse, nor hostile to 
Plaintiffs’ possession.

25.  
The deeds under which Defendants claimed possession of the Disputed Land were 
not filed in the county where the Disputed Land was located (Wichita County, 
Texas).

26.  
Defendants did not actually or visibly appropriate the Disputed Land.

27.  
Defendants did not commence or continue their occasional use of the Disputed 
Land under a claim of right that was inconsistent with or hostile to the claims 
of the Plaintiffs or claims of Plaintiffs’ predecessors.

Conclusions of Law

1.  
Plaintiffs are the fee simple owners of the land described in Exhibit #2, which 
includes a portion of the Disputed Land.

2.  
Plaintiffs are the fee simple owners of the Disputed Land.

3.  
Defendants have no right, title or interest in the Disputed Land or in any other 
land described in Exhibit #2.

5.  
Defendants did not acquire title to the Disputed Land by legal conveyance.

6.  
Defendants did not acquire title to the Disputed Land by adverse possession.

7.  
Plaintiffs’ suit is not barred by limitations.


 
NOTES
1.  
This is not the same as the lyrics to Islands in the Stream written by 
Barry Gibb, Robin Gibb, and Maurice Gibb, released in 1983, and recorded by, 
among others, Kenny Rogers and Dolly Parton (RCA 1983).
2.  
We address Turner and Burden’s issues in this order for ease of discussion.
3.  
Accretion is the process of increasing real estate by the gradual and 
imperceptible disposition by water of solid material, through the operation of 
natural causes so as to cause that to become dry land that was once before 
covered by water.  Brainard v. State, 12 S.W.3d 6, 17 (Tex. 1999).
4.  
The trial court’s Findings of Fact and Conclusions of Law challenged on appeal 
are included in the appendix to this opinion.
5.  
Turner and Burden’s first issue challenges the trial court’s findings of 
fact numbers 2, 4, 7, 10, 11, 12, 13, 14, 15, 16, and 25.
6.  
A gradient boundary is a boundary established by using the survey method created 
for, and approved by, the United States Supreme Court in a series of cases 
styled Oklahoma v. Texas.  See 265 U.S. 500, 504-05, 44 S. 
Ct. 573, 604 (1924); 261 U.S. 340, 341-44, 43 S. Ct. 376, 376-77 (1923); 260 
U.S. 606, 631-32, 43 S. Ct. 221, 224-25 (1923).  For additional information 
on the gradient boundary, see Arthur A. Stiles & Graham B. Smedley, The 
Gradient Boundary—The Line Between Texas and Oklahoma Along the Red River, 
30 Tex. L. Rev. 305 (1952).
7.  
At trial and appeal, both parties addressed accretion under Texas law rather 
than Oklahoma law; thus, we will analyze this issue in accordance with Texas 
law.
8.  
Burden testified that he prepared his red line based upon the 1923 concrete 
survey markers he personally observed on the property.
9.  
Turner and Burden’s third issue challenges the trial court’s findings of 
fact numbers 2, 4, 10, 11, 14, 16, 17, 21, and 25 and conclusions of law numbers 
1, 2, 3, and 5.
10.  
The Red River Boundary Compact (the “Compact”) provides, “It is the 
principal purpose of the party states in entering into this compact to establish 
an identifiable boundary between the states of Texas and Oklahoma along the Red 
River as of the effective date of this compact without interfering with or 
otherwise affecting private property rights or title to [the] property.”  
Tex. Nat. Res. Code Ann. § 12.002 
art. I(b) (Vernon 2001) (emphasis added).  The Compact further provides 
that “[a]ll public records in either party state concerning any lands the 
sovereignty over which is changed by this compact are accepted as evidence 
of record title to such lands.”  Id. art. V(a) (emphasis 
added).  Here, there has been no assertion that the sovereignty of the 
Disputed Land was changed by the Compact.  Further, this dispute involves 
title to property, and the Compact specifically provides that it does not affect 
private property rights or title to property.  See id. art. I(b).  
Accordingly, we conclude that the Compact has no effect on the dispute before 
us.  See id. art I(b), V(a).
11.  
See Olka. Stat. Ann. tit. 
16, § 68 (2002).
12.  
There is no determination as to whether the island existed as such on the date 
of the inception of the Act, triggering the one-year notice requirement.
13.  
Turner and Burden’s second issue challenges the trial court’s final judgment 
and its findings of fact numbers 4, 18, 19, 20, 21, 22, 23, 24, 25, and 27, and 
its conclusions of law numbers 1, 2, 3, 5, 6, and 7.